Stanley Gartenstein, J.
The surprising aspect of this decision holding in contempt the Commissioner of Social Services of the City of New York — and that is the decision of the court — is not that this action, which has been so richly earned, is being taken, but that such remarkable judicial *110 restraint has been shown by the court in not doing so until now. Perhaps this restraint, which is consonant with a Judge’s duty to take every measure possible, short of total surrender of respect for the court itself, has been exercised with the recognition that agencies charged by law with responsiveness to the needs of those they are to serve, are staffed by persons who mean well. In the name of paying respect to these good intentions, we have tried wherever possible to educate and to ignore prior disregard of court mandates in the hope that the best interests of the wards of this court would somehow be served. Unfortunately these hopes are futile ones.
The lessons which the Commissioner of Social Services and indeed, all agency heads, will learn from these proceedings are twofold:
1. The decision of a court of competent jurisdiction will not be unilaterally reversed by any agency functionary from the commissioner himself down to some worker in the field who takes it upon himself to disregard it, unless that decision has been vacated, stayed, reversed or modified by an appellate court. Future compliance will be forthcoming without equivocation or delay. In short, the commissioner is advised that there exists an Appellate Division from which the court will gratefully and respectfully accept and expect reversal if its order is incorrect and/or inappropriate, and that this appellate power does not vest in the commissioner’s hands or in those of one of his social workers.
2. It is not incumbent upon a court or the litigants to search out the appropriate clerk from the incomprehensible maze of red-tape and "organization charts” in a super-agency to discharge a court mandate directed to its commissioner. Rather when the commissioner has been ordered to fulfill his statutory obligation, it is his responsibility to find the proper agent to discharge this mandate; and failing direction from the top, that particular commissioner will have sufficient opportunity while serving whatever sentence is imposed, to ascertain precisely which of his numerous functionaries should have prevented his current problem by acting as required.
the facts:
On February 13, 1976, a petition charging neglect of the three children Otis, Michael and James was filed by the Commissioner of Social Services. This petition alleged that the respondent mother uses alcoholic beverages to excess, losing *111 control of her actions; and further, that on February 9, 1976, when the caseworker came to the mother’s home, it was found to be without food, the respondent mother having used her public assistance moneys for the purchase of alcoholic beverages.
On March 9, 1976, Kim, the emancipated daughter of respondent, and sibling of the three subject children was granted leave, pursuant to section 1032 of the Family Court Act to act as copetitioner, at which time, respondent mother, openly acknowledging her problem, entered an admission to being unable to properly supervise the children. This was accepted by the court on consent in full satisfaction of all charges. Investigation and report were ordered with a view toward disposition which might keep this closely-knit family together while rehabilitating the mother. When efforts at rehabilitation bogged down, an order of disposition was entered on September 23, 1976 placing the children with the Commissioner of Social Services with further directions that the commissioner have the children reside with the emancipated sibling Kim. To augment its decision, the court, on application of the copetitioner, also directed the commissioner, pursuant to section 255 of the Family Court Act to obtain adequate shelter for Kim to care for her siblings; to approve the rental on such living arrangements; and to implement a budget accordingly. The court, in view of disturbing developments at this hearing wherein it was learned that the caseworker was being muzzled by her superiors regarding recommendations concerning the children’s best interests, took the additional precaution of admonishing that failing completion of these arrangements within one month, it would entertain contempt proceedings against the commissioner. In addition, the court took special pains to commend the candor of the caseworker whose courage in testifying truthfully over the efforts of her superiors to undercut her work spoke for itself.
CONTEMPT PROCEEDINGS:
The thrust of the instant contempt proceedings centers around the failure and refusal of the commissioner to obtain adequate housing for Kim so that she may have her siblings live with her.
The torturous history of these proceedings which finally culminated in a hearing before the undersigned on December 3, 1976 is irrelevant except to the extent that it underscores *112 the fact that these three children who were unceremoniously removed from their home 10 months ago are still in temporary shelter in limbo; and that the commissioner has yet to make any tangible good faith effort at reuniting the family.
Before dealing with the legal issues, it is germane to note that there are simple moral considerations before the court. To set these issues in their proper perspective it is necessary to underscore an unconscious slip of the tongue by a witness for the commissioner, one Isidore Baron, office manager of the Linden Social Service Center. Mr. Baron, in referring to Kim’s presence in the welfare center in a vain effort to move the bureaucracy toward compliance with the order, first referred to her by name, and when appropriate to refer to her by pronoun, the one he chose was "it”. What made matters worse was the total unawareness by the witness of his use of the term on the one hand and the attitude underlying it on the other.
The fact remains, Mr. Baron notwithstanding, that we deal here with human beings — more importantly, with children. It should be obvious by now even to the most insensitive, that a child’s scale of time is different from an adult’s and that 10 months in this scale is tantamount to a lifetime (see Goldstein, Freud and Solnit, Beyond the Best Interests of the Child [1973] cited in Matter of Bennett v Jeffreys, 40 NY2d 543, 553 concurring opn Fuchsberg, J.). When these three children spend 10 unresolved months in cold storage as a result of indifference and nonperformance by that agency charged by law with protecting their best interests (Social Services Law, § 398), the damage to them is deep and possibly irreparable. In a penetrating study published by Maas and Engler under the title Children in Need of Parents, it is postulated that (a) most children in foster care should never have been there in the first instance; (b) once a child has been in foster care for a year, the chances are that he will be doomed to spending his entire childhood there; and (c) that the ratio of emotionally disturbed children coming from this background is staggering.
We turn now. to the terrible and immoral disregard for taxpayer dollars which is illustrated by the attitude of the commissioner in this proceeding. By some inexplicable reasoning, it is the commissioner’s contention that because the order in question directs a possible approval of a maximum rent in excess of figures he himself has promulgated, he has the right to disregard it without taking steps to appeal, vacate or stay *113 same. Aside from the crucial fact that the order is no longer appealable because of the commissioner’s inaction in permitting the expiration of time to appeal, his redress if promptly asserted, would have been in a court of competent jurisdiction and not in the unilateral disregard of a valid order.
There is nothing novel about this proposition. It has in fact been underscored numerous times in countless other proceedings. On one occasion when the court’s efforts to educate a coordinate branch of government proved to no avail, it reluctantly moved to contempt proceedings only to be met with compliance at the eleventh hour followed by a letter from the commissioner’s counsel placed on record which must be quoted verbatim to negate the current expressions of pained surprise over the fact that the court actually expects compliance with its mandates:
"June 21, 1976
"Dear Judge Gartenstein:
"I have received a copy of a transcript of a hearing held on March 12 in the above-captioned matter. I have transmitted that copy to Administrator/Commissioner Smith and have additionally discussed it with him at some length.
"As a result of that discussion, Administrator/Commissioner Smith has forwarded the annexed memo to the Executive Cabinet of the Human Resources Administration/Department of Social Services. Additionally, he discussed the issue at length at his most recent meeting of those executives. It is our intent to comply with court orders. I apologize for the circumstances shown in the transcript.
"Very truly yours,
"Hyman Frankel "General Counsel”
A copy of the memorandum follows:
"May 18,1976
"To: Executive Cabinet
"From: J. Henry Smith
"Administrator/Commissioner
"Subject: Compliance with Court Orders "Instances of non-compliance or delayed compliance with Court orders have been brought to my attention. Court orders must be complied with irrespective of the Program Administrators judgment of its correctness. Accordingly, this memorandum directs Program Administrators to totally comply *114 with Court orders unless advised by Counsel that the order has been sthyed pending appeal.”
AUXILUARY CONSIDERATIONS:
Mathematical computations are germane at this point. On record, it was conceded that the maximum rental allowable by the commissioner’s own guidelines in this situation was $218 per month. The cost of foster care per child is set forth in the enclosed letter from counsel:
"December 3, 1976
"Dear Judge Gartenstein:
"During the course of the hearing on December 2, 1976, in this action, I reported to the court pursuant your request that the foster care rate that the Commissioner pays is $175.00 per month per child.
"This information is not correct. The amount which the Commissioner pays a child care agency is $13.25 per day per child, and the normal rate, which the agency pays the foster parent is $175.00 per month.
"The information provided during the hearing was believed to be correct, but a further check revealed it to be in error.
"Very truly yours,
"Elliot R. Marvin "Supervising Attorney "Kings Co. Family Court Unit”
Putting aside the human cost in terms of wrecked or destroyed lives, the cost to the taxpayers for foster care of these children is $1,232.25 per month, more than $1,000 per month in excess of the so-called maximum rental allowance. Yet the commissioner elects to spend this unconscionable sum to keep this family apart when compliance with the court’s order would reduce the cost to the taxpayers to some 20% of the actual current expenditure.
It is not the intention of the court to usurp the functions of the Inspector General of the State of New York. But it does feel ethically and legally bound to call this situation to his attention as well as the fact that it is being repeated in countless situations across the State. A copy of this decision shall be forwarded to him by the clerk.
Two issues remain. The first is a claim that the order in question was never served on the commissioner personally. This claim is rejected in view of the fact that the plenary proceeding itself was brought by the commissioner in his own *115 name; that he vigorously prosecuted and participated in it by his duly designated agents and counsel; and that the token efforts sought to be passed off as compliance were forthcoming as a result of the order. (Puro v Puro, 39 AD2d 873.)
Finally there is the issue of validity of the original order in terms of a directive which might possibly result in accomodations exceeding the so-called maximum rent. This issue is gratuitous; if defective at any time, the order not appealed, is now conclusively the law of the case.
Moreover, the commissioner is now arguing that his own self-imposed limitation is binding upon him. Paraphrased, the commissioner has apparently elected to set a maximum allowance for rent and then fall back behind this maximum he himself has set. To place this argument in perspective, one must cite the dilemma of the Lord Chancellor in Gilbert and Sullivan’s Iolanthe: "The feelings of a Lord Chancellor who is in love with a Ward of Court are not to be envied. What is his position? Can he give his own consent to his own marriage with his own Ward? Can he marry his own Ward without his own consent? And if he marries his own Ward without his own consent, can he commit himself for contempt of his own Court? And if he commit himself for contempt of his own Court, can he appear by counsel before himself, to move for arrest of his own judgment? Ah, my Lords, it is indeed painful to have to sit upon a woolsack which is stuffed with such thorns as these!”
The argument that a commissioner is bound by his own regulations was dealt with in Matter of James B. (75 Misc 2d 1012, 1018) where the court stated: "The Commissioner * * * has the 'legal authority’ to supervene his own regulations; therefore, the Family Court may order it”.
The court accordingly now finds:
1. That the commissioner, charged with the duty of compliance with an order valid on its face to secure and approve adequate housing for Kim has failed, neglected and refused to do so;
2. That he has failed to demonstrate good faith efforts even toward substantial compliance, his maximum effort, even according to his own account, being limited to having a clerk in a social services center refer Kim to another clerk with a direction that she and not the commissioner find the housing;
3. That this failure was willful and was intended to and did *116 actually impair and impede, prejudice and defeat the rights of the copetitioner Kim A., to hers and the children’s detriment;
4. That the Commissioner of Social Services of the City of New York be and he hereby is adjudged in contempt.
The commissioner is granted until January 17, 1977 at 2:00 p.m. to purge the said contempt by actually securing adequate housing for Kim and the children; by approving the rental thereon; and by effectuating actual return of the children to her under supervision. Failing compliance by this date and hour, counsel for copetitioner and/or the Law Guardian are directed to submit an order of commitment ex parte directed to the Sheriff of the City of New York to forthwith apprehend and incarcerate the Commissioner of Social Services for a period of 15 days which is hereby set as the sentence for this contempt by the court.