OPINION OF THE COURT

Per Curiam.

This is a motion by petitioners in the above-captioned appeal to hold respondents Commissioner of the New York State Department of Health, Beth Rifka, Inc., and the administrator of Beth Rifka Nursing Home in civil contempt for having violated the terms of a stay order issued by this court in connection with the appeal. The motion is hereby granted. The importance of the issues raised prompts us to publish this opinion describing our rationale for this disposition.
I
On November 22, 1982, the Commissioner of Health ordered the revocation of the operating certificate of respondent Beth Rifka, Inc., as operator of the Beth Rifka Nursing Home on Staten Island, based upon numerous violations directly related to patient care. The commissioner’s order directed the discharge of all patients from the nursing home by December 1, 1982, leaving the nursing home itself responsible for its continued operation. Two *578 proceedings were instituted on the basis of this order. Beth Rifka commenced an article 78 proceeding challenging the determination to revoke its operating certificate. This proceeding was transferred to the Appellate Division for decision. Several residents of the nursing home commenced a separate article 78 proceeding, seeking an order pursuant to section 2810 (subd 2, par a) of the Public Health Law directing the commissioner to appoint a receiver to supervise the operation of the nursing home and discharge of the remaining patients. Named as respondents were the commissioner, Beth Rifka, Inc., and the nursing home’s administrator, Sally Gearhart. Although Beth Rifka and Ms. Gearhart had been served with all papers in this proceeding, they never appeared. Supreme Court denied petitioners’ application.
The two matters were argued together in the Appellate Division. At that time, Beth Rifka orally joined in petitioners’ request that a receiver be appointed. On January 20, 1983, the Appellate Division decided both matters, confirming the commissioner’s determination to revoke Beth Rifka’s operating certificate (Matter of Beth Rifka, Inc. v Axelrod, 91 AD2d 1143) and affirming Supreme Court’s denial of petitioners’ application to require the commissioner to appoint a receiver (Matter of McCormick v Axelrod, 91 AD2d 1144). The commissioner, by letter dated January 27, 1983, directed that the patients be discharged by February 3.
On January 28, 1983, petitioners presented an order to show cause to an Associate Judge of this court seeking a temporary stay of the involuntary discharge of the nursing home’s residents pending decision on petitioners’ motion for leave to appeal to this court and for a stay in connection therewith. Counsel for the commissioner and petitioners appeared at the hearing on the order to show cause, but no one appeared on behalf of the nursing home or its administrator, despite an earlier representation to the contrary. Beth Rifka had decided to seek leave to appeal and a stay in connection with its own proceeding against the commissioner. At the conclusion of the hearing, the matter of a temporary stay was resolved by the commissioner’s agreement to forbear from taking any action to discharge the *579 residents of Beth Rifka until a decision was rendered by this court on petitioners’ motion. Respondents were ordered to show cause why an order should not be made granting petitioners leave to appeal to this court and staying the involuntary discharge of the remaining residents at Beth Rifka pending determination of the appeal. This order was served upon the commissioner, the nursing home and its administrator, in accordance with its direction to that effect.
On February 17, 1983, this court denied Beth Rifka’s motion for leave to appeal in its article 78 proceeding (58 NY2d 607). We also granted petitioners’ motion for leave to appeal and for a stay. Our order provides: “ordered, that the said motion for a stay be and the same hereby is granted and all steps and/or proceedings to enforce the Appellate Division order of affirmance dated January 21, 1983, or to effect the involuntary discharge of the remaining residents at Beth Rifka Nursing Home stayed pending hearing and determination of the appeal herein.”
Despite this order and on the following day, by lunchtime, all remaining residents of Beth Rifka including petitioners had been discharged and transferred to other nursing homes.
Petitioners then made the present motion to hold David Axelrod, as Commissioner of Health, Beth Rifka, Inc., as operator of the nursing home and Sally Gearhart, as its administrator, in civil contempt of the order of this court,[1] which petitioners alleged had been violated by the involuntary transfer of the remaining residents. The allegations of possibly contumacious conduct having been set forth by petitioners sufficiently to warrant further inquiry, we ordered the parties to present evidence on the issues raised at a hearing before Honorable Joseph F. Gagliardi, Justice *580 of the Supreme Court and administrative Judge of the Ninth Judicial District.
Following conferences related to discovery procedures and possible stipulations, a two-day hearing was held, during which testimony was taken at the nursing homes where petitioners now reside and at the Westchester County Courthouse. Justice Gagliardi’s report, summarizing the evidence and reporting his factual findings and conclusions, was delivered to this court on June 1, 1983.
The hearing focused primarily upon whether and to what extent the various respondents had knowledge of this court’s February 17 order and whether their conduct violated its express terms. The record indicates that on the afternoon of February 17, counsel for all parties learned of the disposition of the relevant motions. Helaine Barnett, the Legal Aid attorney representing petitioners, testified that she had a telephone conversation that afternoon with Irwin Karassik, the attorney for Beth Rifka and Ms. Gear-hart. Mr. Karassik asked her to have Legal Aid arrange funding for the continued operation of the nursing home. Although Mr. Karassik testified that he informed Ms. Barnett of his belief that this court’s stay did not in any way restrain his client’s conduct, Ms. Barnett emphatically denied that the information was communicated to her, until after all patients had been discharged.
At about the same time, Department of Health personnel learned that this court had granted petitioners a stay. Carolyn Scanlan, Associate Director of the Division of Health Facility Standards and Control in the office of Health Systems Management, testified that she never learned the precise terms of the court’s order, but thought that it prohibited the department only from closing the facility and itself discharging the patients. Ms. Scanlan called Elaine Kesner, then long-term care program director in the department’s New York City area office and informed her that a stay had been granted.
The testimony of the three petitioners indicates that, during the evening hours of February 17, they were informed by Ms. Gearhart and other personnel that they would have to leave the following morning. Their belongings were put into cardboard boxes or plastic bags. Peti *581 tioners were quite distressed at this news and all had difficulty sleeping that night. They all suffered varying degrees of emotional upset.
The following morning, Ms. Scanlan realized that the Beth Rifka staff might simply abandon its remaining residents, and had Department of Health staff contact the New York City office to ensure that monitoring of the facility would continue. Shortly thereafter, Ms. Gearhart informed Ms. Kesner that Beth Rifka was closing and that other facilities might be contacting the department regarding transfer of the patients. In a subsequent telephone conversation among Ms. Kesner, Ms. Scanlan and counsel to the department, they worked out the language that was to be used in communicating with other facilities, attempting to limit department involvement so that it would not be deemed in violation of this court’s order. During the course of the morning, Clove Lakes and Holy Family Nursing Homes, the facilities to which petitioners were transferred, asked Department of Health personnel for authorization to “overbed” in order to accept the patients being transferred from Beth Rifka. Ms. Scanlan authorized the overbedding, thus allowing the facilities to exceed their actual certified bed capacity as previously established by the department. The nursing homes were told that if they could handle the additional patients at the appropriate level of care and if the patients wanted to transfer to the particular facility, the department had no objection to the overbedding.
Although it was Ms. Kesner’s impression that the patients were being transferred to facilities of their choice, she had no personal knowledge that this was so. No one from the Department of Health attempted to contact petitioners or their counsel to ascertain whether they were, in fact, leaving voluntarily or to inform petitioners of the terms of this court’s stay. Ms. Gearhart was never told to delay discharge until the monitors arrived, nor was authorization for overbedding withheld until the monitors arrived at Beth Rifka.
The attorney-in-charge of Legal Aid’s Staten Island office, who had been asked by Ms. Barnett to contact Beth Rifka concerning health benefits for the patients and to inform petitioners of the judicial stay prohibiting their *582 involuntary movement, began trying to telephone Ms. Gearhart the morning of February 17. She contacted the nursing home at about 10:55 a.m. and was informed that Ms. Gearhart was too busy to speak with her. The attorney was left on hold, at her request, until 11:30 a.m., when Ms. Gearhart came to the telephone and told the attorney that the question of funds for the patients was complex and she had no time to discuss it just then. When the attorney called Beth Rifka again at 2:00 p.m. she was informed that the patients were gone. In fact, it appears that all patients had been transferred out by 12:40 p.m. when Department of Health monitors arrived at the nursing home.
On the basis of this record, Justice Gagliardi concluded that: (1) petitioners had been transferred from Beth Rifka involuntarily on February 18; (2) that the Department of Health facilitated and participated in the patients’ transfers after obtaining knowledge that this court had stayed their involuntary movement; and (3) Beth Rifka and Ms. Gearhart discharged petitioners and transferred them against their will, when counsel had knowledge that petitioners had obtained a stay. We accept these findings as representing the most reasonable interpretation of the evidence and conclude that petitioners have demonstrated, with reasonable certainty, that respondents have, by their conduct, deprived them of a substantial right secured by the stay and should therefore be held in contempt. Further, we fix the fine at the amount of damages found by Justice Gagliardi to have been suffered by the three petitioners as a result of respondents’ disregard of this court’s stay.
II
Petitioners sought, by this motion, to have this court hold respondents in contempt pursuant to section 753 (subd A, par 3) of the Judiciary Law, which provides, in relevant part: “A court of record has power to punish, by fine and imprisonment, or either, a neglect or violation of duty, or other misconduct, by which a right or remedy of a party to a civil action or special proceeding, pending in the court may be defeated, impaired, impeded, or prejudiced, in any of the following cases: * * * 3. A party to the action or special proceeding * * * for any other disobedience to a lawful mandate of the court”. Civil contempt has as its aim *583 the vindication of a private right of a party to litigation and any penalty imposed upon the contemnor is designed to compensate the injured private party for the loss of or interference with that right (State of New York v Unique Ideas, 44 NY2d 345). Criminal contempt, on the other hand, involves vindication of an offense against public justice and is utilized to protect the dignity of the judicial system and to compel respect for its mandates (King v Barnes, 113 NY 476). Inasmuch as the objective is deterrence of disobedience of judicial mandates, the penalty imposed is punitive in nature (State of New York v Unique Ideas, supra). Although the line between the two types of contempt may be difficult to draw in a given case, and the same act may be punishable as both a civil and a criminal contempt, the element which serves to elevate a contempt from civil to criminal is the level of willfulness with which the conduct is carried out (compare Judiciary Law, § 753, subd A, par 3 [civil contempt], with id., § 750, subd A, par 3 [criminal contempt]; see, e.g., Sentry Armored Courier Corp. v New York City Off-Track Betting Corp., 75 AD2d 344). It is clear, in the present case, that the record does not support a finding of the willfulness necessary to hold respondents, particularly the Commissioner of Health, in criminal contempt. Accordingly, our further discussion is limited to the elements of civil contempt.
In order to find that contempt has occurred in a given case, it must be determined that a lawful order of the court, clearly expressing an unequivocal mandate, was in effect. It must appear, with reasonable certainty, that the order has been disobeyed (e.g., Pereira v Pereira, 35 NY2d 301, 308; Matter of Spector v Allen, 281 NY 251, 259; Ketchum v Edwards, 153 NY 534, 539; Coan v Coan, 86 AD2d 640, 641, app dsmd 56 NY2d 804). Moreover, the party to be held in contempt must have had knowledge of the court’s order, although it is not necessary that the order actually have been served upon the party (e.g., People ex rel. Stearns v Marr, 181 NY 463, 470; Power Auth. of State of N. Y. v Moeller, 57 AD2d 380, 382; Shakun v Shakun, 11 AD2d 724). Finally, prejudice to the right of a party to the litigation must be demonstrated (see Judiciary Law, § 753, subd A).
*584 This court’s February 17 stay order expresses a clear mandate that “all steps and/or proceedings * * * to effect the involuntary discharge of the remaining residents of the Beth Rifka Nursing Home [are] stayed pending hearing and determination of the appeal herein”, which was in effect at the time petitioners were transferred. The commissioner’s argument that this language can only be interpreted as prohibiting him from setting another date for discharge represents a misreading of the clear language of the order. The broad language prohibiting involuntary discharge makes plain that the residents were not to be removed against their will.
The order’s clear mandate was violated when petitioners were transferred from Beth Rifka over their expressed protests that they did not wish to leave. The nursing home and Ms. Gearhart were, of course, directly responsible for the involuntary discharge. The Department of Health, as found by Justice Gagliardi, facilitated and participated in the patients’ transfers. Although department personnel testified that they were aware that involuntary movement of the patients was prohibited by the order, no effort was made to ascertain whether they were leaving voluntarily. Given the extent to which petitioners had pursued their desire to remain at Beth Rifka until a receiver was appointed, it was entirely unreasonable to assume that, the very day after petitioners had been granted a stay, they were leaving voluntarily. Thus, we conclude that department personnel should have known that petitioners were being transferred against their will or, at the very least, acted or refrained from acting at their peril without having verified that the transfers were voluntary. Their subsequent participation in and facilitation of the discharge by approving appropriate levels of care, authorizing over-bedding in other facilities and permitting the transfers to be accomplished without even having monitors present must be deemed conduct in violation of the stay. Without the department’s intervention, the transfers could not have been completed. It is clear that a party who assists another in a violation of judicial mandate can be equally as guilty of contempt as the primary contemnor (People ex rel. Drake v Andrews, 197 NY 53; People ex rel. Stearns v Marr, 181 *585 NY 463). Thus, although the department’s participation in the patients’ involuntary discharges was only indirect, its assistance to the nursing home forms the basis for the conclusion that the department also violated the stay.
We also conclude that all parties or their counsel, had sufficient knowledge, actual or imputed, of the terms of the stay, to render their conduct in disregard of the stay contumacious. Counsel for the nursing home and its administrator testified that he learned from the Court of Appeals clerk’s office only that petitioners had obtained a “continuation” of the stay. Counsel interpreted this to mean that the commissioner’s prior agreement to forbear from closing Beth Rifka had been continued and that his clients were therefore under no restraints. He attempted to bring this “anomaly” to the attention of the clerk’s office, but was informed simply that this court had surely considered the effect of its order. Despite the perceived existence of this anomaly, counsel never undertook to learn the precise terms of the stay. Under the circumstances, we conclude that his failure to do so was entirely unreasonable. Counsel had represented the nursing home and Ms. Gearhart throughout this proceeding, in which they were named respondents and received all papers, including the order to show cause, which clearly indicated that petitioners sought a stay against their involuntary discharge. Counsel assumed that the stay applied only to the commissioner at his own peril; he was not entitled to avoid its effect by failing to inquire further. Moreover, Ms. Gearhart indicated her personal awareness of the thrust of the stay, by her failure to inform the Legal Aid attorney that patients were being discharged at the very moment the attorney was waiting to speak with her about possible sources of continued funding. It is not without significance that neither Ms. Gearhart nor any other person from the nursing home testified at the hearing in opposition to the evidence of their possibly contumacious conduct.
Department of Health personnel testified that they knew of the stay, but not its precise terms. Although there is testimony that the department believed that the commissioner was merely prohibited from closing down the nursing home, other testimony indicates awareness that the *586 stay was against the patients’ involuntary movement. Further, we conclude that the department also had an obligation, once it knew that a stay had been granted, to determine what its terms were. Moreover, it appears that department personnel undertook a course of conduct designed to accomplish transfer of the patients while creating the appearance that the department was uninvolved. In particular, concern was expressed on February 18 that if the Legal Aid attorneys were to find out what was taking place at Beth Rifka, they might try to have the commissioner held in contempt. The log entries of Ms. Kesner, in which she detailed her conversations concerning the events at the nursing home demonstrate a keen awareness of the possibility that the stay might be violated by Department of Health activities.[2]
It is argued, on behalf of the commissioner that he personally did nothing to violate our stay order and that he cannot be held in contempt solely on the basis of his subordinates’ conduct. The commissioner is named as a party in this proceeding and on the stay order. Although we realize that he personally engaged in no purposeful conduct in violation of this court’s order, it is equally clear that he delegated to his subordinates the authority to act for him in this matter and must remain accountable for the manner in which it was handled by his staff. The commissioner is being held in contempt, not personally, but solely in his representative capacity as head of a very large State agency. Although we recognize the difficult position the commissioner is placed in when his staff fails to comply with a court order properly, nevertheless, this court cannot *587 be expected to name every one of the commissioner’s employees in its order to ensure its effectiveness. The commissioner having chosen to act through his subordinates may not escape the consequences of their contumacious conduct (see, e.g., Friendly Ice Cream Corp. v Great Eastern Mall, 51 AD2d 883, app dsmd 39 NY2d 1032; Matter of Otis A., 89 Misc 2d 109).
Finally, petitioners were clearly deprived of a substantial right by the conduct of respondents. They commenced this proceeding to have a receiver appointed to supervise their discharge from Beth Rifka. The stay was meant to ensure that any relief petitioners might be deemed entitled to was not rendered altogether academic by their involuntary, unsupervised discharge pending decision of the appeal. Petitioners’ discharge in violation of that stay deprived them of their potential right to be transferred in an orderly responsible manner under the direct supervision of the Department of Health. Although it is unnecessary to this finding, it is not insignificant that we have determined that petitioners were entitled to the relief they sought (see Matter of McCormick v Axelrod, 59 NY2d 568 [decided herewith]). Petitioners’ damages were determined by Justice Gagliardi based upon such factors as the degree of emotional upset suffered by each of these elderly women, the period of time required for adjustment to their new surroundings, and the benefits to petitioners from their new placements. We conclude that the damage amounts reached are reasonable.
Accordingly, petitioners’ motion to hold respondents Commissioner of Health, Beth Rifka, Inc., and Sally Gear-hart in contempt is granted, and respondents áre fined in the total amount of $4,000 for which they shall be deemed jointly and severally liable to be paid to petitioners as follows: $2,500 to be paid to petitioner Louise McCormick; $1,000 to be paid to petitioner Maria Bonsignore; $500 to be paid to petitioner Theresa Coppola.
Chief Judge Cooke and Judges Jasen, Jones, Wachtler and Simons concur in Per Curiam opinion; Judge Meyer taking no part.
*588 Motion to hold respondents Commissioner of Health, Beth Rifka, Inc., and Sally Gearhart in contempt granted, etc.

. Although the motion papers indicated that petitioners also sought to hold the commissioner in contempt for having violated his January 28 agreement, petitioners appear to have abandoned this effort. It is clear, in any event, that even if the commissioner’s conduct were contrary to this agreement, which does not appear to be the case, the agreement qould not have been violated, because it had expired by its own terms when this court decided petitioners’ motion, before the remaining residents were discharged.

. Ms. Kesner recorded the following entry in her log after learning that Beth Rifka was closing: “Any calls about the move refer to Beth Rifka for information; we are aware * * * don’t release anything. When Legal Aid hears will go to court against involuntary movement and allege Commissioner is in contempt; be careful to say to facility staff and keep a log; if Beth Rifka is sending patients *** that placement is appropriate, it is all right with us for patient to be placed with you today”.
After she learned that all patients had been transferred from Beth Rifka, Ms. Kesner recorded this entry: “John [Stefani, counsel to Department of Health]. Just spoke to Peter Shieff in AG’s office, wants us to be very careful; do we have a monitor 2/17/83 at Beth Rifka? Write down notes about what they did. Also today’s monitors; log what we did step by step; should demonstrate activity today was at Beth Rifka’s; nothing we did precipitated it”.