OPINION OF THE COURT
Matthew F. Cooper, J.
In this matrimonial proceeding, defendant wife seeks to have the court use its civil contempt powers to punish plaintiff husband for a violation of orders that are automatically triggered by the commencement of an action for divorce. The automatic orders, which became part of New York State divorce procedure in 2009 with the enactment of Domestic Relations Law § 236 (B) (2) (b) and the promulgation of 22 NYCRR 202.16-a, prohibit the unauthorized transfer of marital assets during the pendency of the case.
Here, there is little question that plaintiff violated the automatic orders by using close to $4 million in marital funds to purchase a house in Connecticut after he started this proceeding. As will be explained, the court finds that although civil contempt is an available remedy when a party transfers assets in violation of the automatic orders, it is not an appropriate remedy on these facts.
Background
Plaintiff commenced this divorce action on November 3, 2010, by filing a summons with notice. On or about December 3, 2010, defendant was served with the summons. Included with the summons was the “Notice Re: Automatic Orders,” which recites verbatim the language of the automatic orders as provided in Domestic Relations Law § 236 (B) (2) (b) and 22 NYCRR 202.16-a and sets forth their applicability to both parties. The parties exchanged net worth statements on March 10, 2011. Plaintiffs net worth statement was sworn to on February 11, 2011, but reflected assets as they existed on November 1, 2010, two days before the commencement date of the action. From plaintiffs net worth statement and from his affidavit in opposition to defendant’s motion for contempt, it appears that the parties are fortunate enough to have a marital estate worth in *546 excess of $16 million, with approximately $12 million in liquid assets.
Plaintiff admits that after the commencement of the action he wrote checks totaling $49,409.34 from the parties’ joint account to his fiancée, his fiancée’s divorce attorney, and another individual. He also admits to having purchased his fiancée a diamond engagement ring for over $70,000. Plaintiff contends, however, since the time the divorce action began he has earned more than $10 million as a hedge fund manager, and therefore whatever he has spent on his fiancée should be viewed as having come from his current income and not from marital funds. On the other hand, plaintiff fully acknowledges that the Connecticut house, which he purchased on April 18, 2011 for $3,795,000, was bought with marital funds.
Defendant contends that the automatic orders of Domestic Relations Law § 236 (B) (2) (b) and 22 NYCRR 202.16-a constitute an unequivocal mandate of the court and that plaintiff is charged with knowledge of such orders as the party who commenced the action. In light of plaintiffs unilateral expenditure of marital assets since the commencement of this action, and in particular his use of marital funds to buy himself an expensive house, defendant asserts that her equitable distribution rights have been prejudiced. Defendant further contends that plaintiff willfully failed to disclose in his net worth statement the transfer of assets to his fiancée and that the court relied on this misstatement in awarding interim counsel fees to defendant. As a remedy for these alleged breaches of the restraint on the transfer of assets and compulsory disclosure found in the automatic orders, defendant moves to have plaintiff held in contempt of court and to have him fined, imprisoned, and restrained from making any further transfers of marital assets. Defendant also seeks attorney’s fees in excess of $20,000 for having to bring the motion. Finally, with the request being made for the first time in defendant’s reply affidavit and then by her attorney at oral argument, defendant seeks an order directing plaintiff to deposit $8 million of the $12 million in liquid marital assets in escrow until resolution of this action.
Plaintiff opposes defendant’s application, specifically a finding of contempt, on the grounds that defendant’s rights have not been prejudiced — a prerequisite to a contempt finding — and that effective remedies alternative to contempt are available. Though admitting to having used marital funds to purchase the Connecticut house, plaintiff argues that he has not dissipated *547 the marital estate but merely converted a liquid asset into real property. Plaintiff further asserts that the funds spent on his fiancée were from his personal post-commencement earnings, that the net worth statement was a true and accurate reflection of his financial information as of the date of its completion on November 1, 2010, and that defendant has not demonstrated that plaintiff attempted to dispose of marital assets so as to prejudice defendant’s entitlement to equitable distribution.
Legal Analysis
I. Contempt Based on Plaintiffs Alleged Dissipation of Marital Funds
The court need not delve into a lengthy analysis as to whether civil contempt is an available remedy for a violation of the automatic orders. This past year, Justice Ellen Gesmer held in ES. v R.O. (31 Misc 3d 373 [Sup Ct, NY County 2011]), that the promulgation of Domestic Relations Law § 236 (B) (2) (b) as a court rule in 22 NYCRR 202.16-a constitutes a “lawful mandate [ ] of the court” and that the legislative history of Domestic Relations Law § 236 (B) (2) (b) clarifies “that the Legislature intended that a violation of the automatic orders would be redressed by the same remedies available for violations of any order signed by a judge.” (Id. at 376.) This court agrees fully with Justice Gesmer’s sound reasoning and it concludes as she did that a party who violates the automatic orders is subject to being punished for contempt of court.
In order to adjudge a party in civil contempt, a court must conclusively determine three things: (1) the existence of a lawful order expressing an unequivocal mandate of which the party had knowledge; (2) the disobedience of such order; and (3) that the rights and remedies of a party to the action were prejudiced by the violation of the order. (Matter of McCormick v Axelrod, 59 NY2d 574, 583 [1983]; Judiciary Law § 753 [A] [3].) Here, it has been established that the automatic orders are a lawful mandate of the court. (See P.S. v R.O., 31 Misc 3d at 376.) It has been further established that plaintiff, by instituting the action and causing the summons to be served, had actual or constructive knowledge of the language of the automatic orders contained within the summons. Finally, it is undisputed, and in fact admitted, that plaintiff breached the terms of the automatic orders by using marital funds for the purchase of the Connecticut house. Thus, the only issues remaining to be determined before a finding of contempt can be made is whether plaintiffs *548 breach of the automatic orders prejudiced defendant’s rights in this ongoing action (see Judiciary Law § 753 [A]; McCormick, 59 NY2d at 583 [“prejudice to the right of a party to the litigation must be demonstrated”]) and whether alternative remedies to a finding of contempt are unavailable or would be ineffectual. (See Farkas v Farkas, 201 AD2d 440 [1st Dept 1994].)
Prior to determining whether plaintiff’s conduct rises to the severity of a contempt, it is useful to examine the legislative history leading to the enactment of the law establishing the automatic orders. In the Assembly’s Memorandum in Support of Legislation, it is stated that the automatic orders are needed “to prevent both parties from dissipating assets, incurring unreasonable debts, or removing a party or the children from health or life insurance policies.” (Mem in Support of 2009 NY Assembly Bill A2574, Bill Jacket, L 2009, ch 72; see also Introducer’s Mem in Support, 2009 NY Senate Bill S2970.) Despite the fact that the word “dissipating” is not used in the automatic orders, it is clear from the history that one of the Legislature’s prime concerns in enacting the law was to provide a means to remedy an all-too-common problem: that one of the parties to a divorce would undermine the equitable distribution process by spending, transferring or concealing marital property. Thus, a court, in considering an alleged violation of the automatic orders, must look not only to the actual text of the orders themselves, but it should view the violation from the perspective of the Legislature’s articulated concern for preventing the dissipation of assets.
Dissipation has a specialized meaning within the context of matrimonial law. It has often been characterized as having a nefarious or devious undertone carrying the implication that the party transferring the funds did so with the intent of impeding the economic rights of the other spouse and preventing the court from making a fair and equitable distribution of the marital estate. (See Blickstein v Blickstein, 99 AD2d 287, 293 [2d Dept 1984]; Hartog v Hartog, 1992 WL 695903 [Sup Ct, NY County 1992].) In some cases, the dissipation consists of the transfer of marital funds to a secret bank account (see e.g. Maharam v Maharam, 245 AD2d 94 [1st Dept 1997]), or a spouse’s use of marital property to pay for personal expenses and debts (see e.g. Dewell v Dewell, 288 AD2d 252 [2d Dept 2001]). In other cases, the dissipation takes the form of transfer of funds without fair consideration to third parties. (See e.g. Davis v Davis, 175 AD2d 45 [1st Dept 1991].) In almost all cases, it involves *549 conduct by which a party seeks to hide or improperly dispose of marital assets during the pendency of a divorce action.
In this case, there can be no dispute that plaintiffs purchase of the Connecticut house with marital funds — alternatively characterized by plaintiff as a conversion of marital funds from cash into real property — violated the plain language of the automatic orders.* The funds used to purchase the property are acknowledged to be part of the marital estate, and although plaintiff states that he informed defendant of his plans to buy the house there is no suggestion that defendant ever consented to the transaction, in writing or otherwise, or that it was done pursuant to court order. On the other hand, plaintiffs purchase of the house in which he now resides — albeit with title not being in his name but instead being held in trust with plaintiff as the sole equitable owner — bears little of the indicia of a transaction undertaken so as to undermine equitable distribution. The $3,795,000 in marital funds used to purchase the residence, though no longer in the form of a liquid asset, remain part of the marital estate subject to equitable distribution in the form of the Connecticut house. While plaintiffs actions may have violated the letter of the automatic orders, it cannot be said that those actions resulted in the kind of dissipation of marital assets that the Legislature was seeking to combat when it enacted the law.
Turning from the legislative intent behind the automatic orders to the elements necessary for contempt, the court’s attention is again focused on the results of plaintiff’s actions rather than on the actions themselves. This is because the key issue is whether defendant’s rights and remedies were prejudiced by the violation of the automatic orders. With regard to the Connecticut house, it remains every bit as much marital property as it did when it was $3,795,000 in cash. Defendant can readily be made whole as a result of plaintiffs actions in that she will be entitled to a credit for the purchase price of the house or its value at the commencement of trial, whichever is *550 greater, as well as a credit for any fees or costs that were incurred in the purchase of the house and were paid by plaintiff with marital funds. With regard to the payments made to or on behalf of plaintiff’s fiancée, including the purchase of the engagement ring, if it can be shown at trial that those expenditures were indeed made from marital funds and not from plaintiff’s separate income stream, then defendant will be entitled to a credit for those sums as well. In light of the parties’ significant liquidity — there being $12 million available to offset plaintiffs expenditures that total at most $4 million — it can safely be said that neither defendant’s rights under equitable distribution nor the remedies available to her to satisfy those rights have been prejudiced in any measurable way. Accordingly, plaintiff cannot be held in contempt of court as a result of his purchase of the Connecticut house or the expenditures he made with regard to his fiancée.
At oral argument on the motion, defendant’s counsel sought to make the point that it would be unfair for the court to refrain from holding plaintiff in contempt simply because he has enough money to cover expenditures made in violation of the automatic orders. This, according to counsel, would be treating plaintiff differently from other litigants because of his wealth. The point is well taken. But as F. Scott Fitzgerald is reputed to have said, “the rich are different from you and me.” In matrimonial cases in general, the rich are different from other litigants in that they generate more motions, demand more trial time, and all in all take up a disproportionate share of judicial resources. In a matrimonial case like this one, the rich are different from others in that they have more assets — particularly liquid ones — to offset improper expenditures made with marital funds. Fair or not in terms of society as a whole, the fact remains that it is precisely because of the plaintiffs great wealth that what might be a contempt under other circumstances is not one here. Whereas in a case involving people of more limited means the transfer of $20,000 — let alone $4 million — in marital funds would severely prejudice a spouse’s rights to equitable distribution, here there is more than enough money on hand to insure that defendant receives her fair share of the marital estate. And absent harm or the lack of a remedy, there is simply no basis in law for punishing a party — rich or poor — for civil contempt. (See Matter of Department of Hous. Preserv. & Dev. of City of N.Y. v Deka Realty Corp., 208 AD2d 37, 43 [2d Dept 1995].)
*551 II. Contempt Based on Plaintiff’s Alleged Failure to Disclose Expenditures
Defendant argues that plaintiff should also be found in contempt of court because he violated the automatic orders by intentionally failing to disclose the expenditures of marital funds in his net worth statement. As is clearly noted on the face of the statement, the values that are set forth there reflect plaintiffs assets and liabilities as they existed on November 1, 2010, two days prior to the commencement of the case. Plaintiff admits to having transferred assets after that date, but the transfer was never reflected in an updated net worth statement. Defendant, of course, has a remedy available to her short of contempt: she can demand a new net worth statement, something it appears that she has not yet done. In any event, a current statement will be required by the court from both parties prior to the pretrial conference. Once again, the availability of a remedy and the lack of actual harm, precludes plaintiff, under the circumstances presented here, from being held in contempt of court.
III. Defendant’s Request for Additional Relief
The court has determined that in this instance it cannot find plaintiff in contempt of court as a result of his violating the automatic orders by transferring assets or failing to immediately report those transfers. This determination, however, should not be taken as an indication that plaintiffs conduct is acceptable and can in any way be countenanced. Plain and simple, plaintiffs conduct is unacceptable irrespective of the fact that to this point he has had the resources available to him with which to mitigate the adverse effect of that conduct on defendant’s rights under equitable distribution. If plaintiff were permitted to continue converting liquid marital assets into real property, as he has done here, or into other nonliquid assets, this could very likely result in defendant’s rights being significantly harmed. This is because of the possibility of there no longer being enough cash on hand in the estate to be awarded to defendant upon the resolution of the case as an offset against the transfers. Instead, the parties would have to engage in the onerous task of having valuations done of the nonliquid assets, followed by the court-ordered sale of the property.
The determination that plaintiff has already violated the automatic orders, and by so doing has demonstrated that he has the potential to do so again, requires that defendant be granted the injunctive relief she seeks to prevent further misconduct that would “adversely affect the movant’s ultimate rights in equitable distribution.” (Guttman v Guttman, 129 AD2d 537, 539 [1st Dept 1987] [“the prevailing rule ... is to require that *552 pendente lite restraints on property transfers be supported by proof that the spouse to be restrained is attempting or threatening to dispose of marital assets so as to adversely affect the movant’s ultimate rights in equitable distribution”].) Accordingly, plaintiff will be enjoined and restrained from transferring or otherwise converting funds from the parties’ accounts or other marital property, except for basic living necessities, attorney’s fees, or other court-approved expenditures, until the conclusion of this action.
The court will not address defendant’s oral application for an order directing plaintiff to deposit $8 million in escrow during the pendency of the case. This specific form of relief, which was not requested in the moving papers and consequently not addressed by plaintiffs opposition papers, is too dramatically different from the relief that was sought in the moving papers. (See Frankel v Stavsky, 40 AD3d 918, 919 [2d Dept 2007].) Moreover, the granting of injunctive relief to defendant, along with the admonishment that plaintiff has received in this decision, should prove sufficient to prevent further misconduct without the need for escrow. Suffice it to say that if plaintiff were to engage in the further transfer of assets, the very least of the consequences he would face would be having to deposit money in escrow.
Finally, defendant is entitled to reasonable and necessary attorney’s fees as a result of her having to bring this motion in response to plaintiff having failed to obey the requirements of the automatic orders. (See Domestic Relations Law § 238.) Based on the extent of the papers drafted and the number of court appearances required, as well as defendant’s attorneys’ billing statements included as exhibits to the motion, the court finds that an award of $15,000 is warranted.
Conclusion
In light of the foregoing, it is hereby ordered that defendant’s motion is granted to the extent that plaintiff is enjoined and restrained from transferring or otherwise disposing of assets as provided for in the body of this decision; and it is further ordered that plaintiff is directed to pay defendant’s counsel the sum of $15,000 as and for reasonable attorney’s fees within 10 days of the date of this decision; and it is further ordered that all other relief sought in defendant’s motion is denied, without prejudice to defendant seeking such relief in the event plaintiff were to commit further acts in violation of the automatic orders.

 (See 22 NYCRR 202.16-a [1] [c] [1] [“Neither party shall sell, transfer, encumber, conceal, assign, remove or in any way dispose of, without the consent of the other party in writing, or by order of the court, any property (including, but not limited to, real estate, personal property, cash accounts, stocks, mutual funds, bank accounts, cars and boats) individually or jointly held by the parties, except in the usual course of business, for customary and usual household expenses or for reasonable attorney’s fees in connection with (the) action”].)