*647 OPINION OF THE COURT
Gustin L. Reichbach, J.
Petitioner, Department of Housing Preservation and Development (hereinafter referred to as DHPD), seeks by motion dated September 23, 1992, to have the court hold respondent Anthony Ieraci in both criminal and civil contempt (Judiciary Law §§ 751, 753) for disobedience of an order, dated March 28, 1990, of the Hon. Gerald Bank, in which respondent consented to correct all violations of record at 1618 Beverly Road, Brooklyn. Petitioner also seeks the imposition of civil penalties against respondent for failure to timely correct certain of those violations (Administrative Code of City of NY § 27-2115), as well as an order to correct outstanding violations (Administrative Code § 27-2120).
The respondent, despite cautions by both Judge Bank and this court, has insisted on representing himself throughout these extended proceedings. In June of 1989, petitioner, DHPD, brought what is known as a "comprehensive” proceeding seeking both civil penalties and an order to correct against respondent. That action was settled by the consent order of March 28, 1990, compliance with which is the subject of the instant contempt proceeding.
Subsequent to the order of March 28, 1990, an initial contempt proceeding was brought by petitioner on February 6, 1991 (hereinafter referred to as Contempt 1). That proceeding was brought as a result of DHPD inspections conducted November 28, 1990 and December 5, 1990. Contempt 1 was settled by entry of a second consent order dated June 18, 1991. On respondent’s application, that second consent order was eventually vacated by order of Hon. Gerald Bank on August 7, 1992. As a result, Contempt 1 was reinstated. Contempt 1 sought to hold respondent in both criminal and civil contempt and to assess civil penalties for the claimed failure of respondent to timely correct 33 specific violations that were part of the March 28, 1990 consent order. That action came on to be tried before Judge Knipel and resulted in a finding by the court on September 14, 1992, that petitioner had not carried its burden of proof and, consequently, the court dismissed Contempt 1.
Prior to the commencement of this trial (hereinafter referred to as Contempt 2), respondent raised the claim that this proceeding could not be maintained because of the prior decision and judgment rendered in respondent’s favor in Contempt 1.
*648 Respondent’s claim, while inarticulately presented, raises complex questions involving the doctrines of double jeopardy, mandatory joinder of claims, res judicata and the inherent power of the court to fairly control the administration of justice. Respondent argues that petitioner has had its chance to prosecute him for the claim that he failed to comply with the consent order of March 28, 1990 and that in dismissing the City’s prior proceeding, Judge Knipel necessarily credited respondent’s evidence that all repairs had been timely made. The petitioner argues that the 33 violations for which contempt and civil penalties are now sought are different violations than those sued upon in the earlier proceeding and thus considerations of double jeopardy and res judicata do not apply. All that Judge Knipel determined, DHPD argues, is that petitioner failed to meet its burden of proof as to one set of 33 violations and this proceeding involves an entirely different group of 33 violations.
The court has reviewed the transcript of the trial before Judge Knipel to determine what issues were raised in Contempt 1 and Judge Knipel’s findings regarding them. To prove its case in Contempt 1 DHPD relied exclusively on four inspection reports dated November 28, 1990, December 5, 1990, August 27, 1992 and September 2, 1992. Respondent’s case in Contempt 1 consisted of the testimony of respondent Anthony Ieraci and his friend, John Vanderborg, that they had gone through the list of violations together and completed all necessary repairs a year or two ago. No bills or receipts were submitted into evidence. Judge Knipel credited the sworn denials of the respondent and Mr. Vanderborg, rejected the accuracy of the four inspection reports received in evidence, and dismissed the proceeding. It matters not whether this court would have come to the same conclusions as Judge Knipel.[1] What this court must resolve is the impact of Judge Knipel’s finding in Contempt 1 on this proceeding.
The same inspection reports that were admitted into evidence in Contempt 1 were also submitted by DHPD in this case.[2] Thirty of the 33 violations sued upon in Contempt 2 *649 appear in the inspection reports of November 28, 1990 and December 5, 1990 and thus were known to the City prior to the time it brought Contempt 1. Despite this knowledge, these violations were not made part of Contempt 1. The City’s only response to the court’s queries as to why these claims were not included in the earlier action was simply that it had been "a mistake.” The court thereupon dismissed these 30 violations sued upon in Contempt 2. The court permitted petitioner to pursue criminal and civil contempt in Contempt 2 only as to the three violations about which it did not have proof when it commenced Contempt 1.

Double Jeopardy, Res Judicata and Mandatory Joinder of Claim

In their most narrow and classical definitions, the doctrines of double jeopardy and res judicata would not be applicable to bar the Contempt 2 proceeding.
Double jeopardy is a concept of the criminal law which forbids successive prosecutions for the same offense. It "represents a fundamental ideal in our constitutional heritage”. (Benton v Maryland, 395 US 784, 794 [1969].)
Indeed, unlike most other constitutional claims that can only be pursued on appeal after trial, in New York a denial of a pretrial double jeopardy claim may be reviewed in an interlocutory fashion pursuant to CPLR article 78. (Matter of Wiley v Altman, 52 NY2d 410 [1981].)
The application of the prohibition against double jeopardy requires that a person is put in jeopardy by being subject to multiple prosecutions for the same offense. While DHPD’s various claims of noncompliance all arise from the same consent order, each uncorrected violation constitutes a separate violation of the order and each could individually support a finding of noncompliance. A prosecution for failing to paint one apartment is not the same as being charged with failing to refit a door to another apartment.
Yet, in its application of the State’s criminal law, New York has statutorily expanded the traditional definition of double jeopardy to include separate prosecution for multiple or sepa *650 rate offenses which arise out of the same transaction. When the prosecutor has evidence to support a conviction to all charges but charges some offenses and not others, any subsequent prosecution for the uncharged offense is barred (CPL 40.40 [1], [2]). This is precisely what occurred here. Petitioner brought Contempt 1 alleging 33 uncorrected violations based on the inspection reports of November 28,1990, and December 5, 1990. Those same reports indicate that 30 of the 33 violations charged in Contempt 2 were extant at the time Contempt 1 was initiated. Clearly, the DHPD had an opportunity to join all these claims in the first proceeding. What this court must decide is whether this statutory rule of criminal procedure, which bars separate prosecution of jointly prosecutable offenses, has application to a contempt proceeding under the Judiciary Law.
The United States Supreme Court has held that "Con-tempts are neither wholly civil nor altogether criminal.” (Gompers v Bucks Stove & Range Co., 221 US 418, 441 [1911].) While proceedings for criminal contempt under the Judiciary Law have traditionally been viewed as a special civil proceeding (Department of Hous. Preservation & Dev. v 24 W. 132 Equities, 137 Misc 2d 459 [App Term, 1st Dept 1987], affd no opn 150 AD2d 181, appeal dismissed 74 NY2d 841), even civil contempt proceedings have long been recognized as being "quasi-criminal in character.” (Matter of Hynes v Hartman, 63 AD2d 1, 3 [1st Dept 1978].) In 1972, with considerable prodding from the United States Supreme Court, our New York Court of Appeals recognized that a proceeding for contempt under section 750 of the Judiciary Law was sufficiently "criminal” in nature to bar a subsequent prosecution for contempt under the Penal Law. (People v Columbo, 31 NY2d 947 [1972]; see also, Matter of Capio v Justices of Supreme Ct., 41 AD2d 235 [2d Dept 1973]; People v Failla, 74 Misc 2d 979 [Nassau County Ct 1973].)
While civil in nature, a distinguishing and significant difference between both criminal and civil contempts and other civil proceedings is that a finding of contempt may result in imprisonment. As a consequence, many rights normally extended only in the Penal Law context have been held to be applicable to contempts, both criminal and civil, under the Judiciary Law, including appointment of counsel for an indigent party. (Department of Hous. Preservation & Dev. v Lamison, 118 Misc 2d 1013 [Civ Ct, Queens County 1983]; see also, *651 United States v Bobart Travel Agency, 699 F2d 618 [2d Cir 1983].)
The courts have generally required a standard of proof beyond a reasonable doubt in criminal contempt cases under the Judiciary Law. (Yorktown Cent. School Dist. No. 2 v Yorktown Congress of Teachers, 42 AD2d 422 [2d Dept 1973].) Further, because a finding of contempt can involve incarceration (Judiciary Law § 774 [1]), the standard of proof necessary to find someone in civil contempt is "reasonable certainty,” substantially higher than the normal standard in civil cases of a mere preponderance of the credible evidence. (Matter of McCormick v Axelrod, 59 NY2d 574, 583 [1983].) However, the standard of proof even for civil contempt may be beyond a reasonable doubt if the contemnor is sentenced to a punitive term of imprisonment. (Development Co. v Jones, 99 AD2d 238, 244, 245 [1st Dept 1984] [Sandler, J., dissenting]; see also, Odimgbe v Dockery, 153 Misc 2d 584 [Civ Ct, Kings County 1982].)
This court holds that the failure of the City at the time it brought Contempt 1 to join all those claims for which it then had evidence precludes the City from bringing a second proceeding asserting those same claims.
Even if this court were to find that the doctrine which bars separate prosecutions of jointly prosecutable offenses contained in CPL 40.40 is applicable only to that branch of the proceeding which seeks a finding of criminal contempt the petitioner would still be barred from pursuing its civil contempt claims under the transactional analysis of the res judicata doctrine now favored in New York. (Smith v Russell Sage Coll., 54 NY2d 185 [1981].) "Transactional analysis” bars all of a party’s claims arising out of a given transaction, occurrence or event once any of the claims are litigated by that party. (Supra.)
Chief Judge Cardozo summed up the classic principle of the res judicata doctrine in Schuylkill Fuel Corp. v Nieberg Realty Corp. (250 NY 304, 306-307 [1929]) in this way: "A judgment in one action is conclusive in a later one not only as to any matters actually litigated therein, but also as to any that might have been so litigated, when the two causes of action have such a measure of identity that a different judgment in the second would destroy or impair rights or interests established by the first.”
Judge Fuchsberg, writing for an unanimous Court in Smith *652 v Russell Sage Coll. (54 NY2d, supra, at 192-193), noted that: "in deciding res judicata issues, we have moved to a more pragmatic test, which sees a claim or cause of action as 'coterminous with the transaction regardless of the number of substantive theories or variant forms of relief * * * available to the plaintiff (Restatement, Judgments 2d [Tent Draft No. 4, 1978], § 61, Comment a) * * * what 'factual grouping’ constitutes a 'transaction’ or 'series of transactions’ depends on how 'the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether * * * their treatment as a unit conforms to the parties’ expectations or business understanding or usage’ (Restatement, Judgments 2d [Tent Draft No. 1], §61 * * *).”
Applying these principles to the case at bar, Contempt 1 and Contempt 2 both involve the same parties, charge noncompliance with the same order, seek the same remedy and the imposition of the same penalty. The act of misconduct, i.e., the claim or transaction, which predicates the charges is the same in both proceedings, i.e., noncompliance with the court order of March 28, 1990. Although the particulars of which violations were uncorrected are claimed to be different, noncompliance with the order is the act or "transaction” in issue.
In the instant case, petitioner was aware via its inspection reports of November 28, 1990 and December 5, 1990 of 30 of the 33 violations charged in this second proceeding. All or part of the evidence of any violations would have supported a finding of contempt in either proceeding. As explained in Restatement (Second) of Judgments, § 24, comment a, at 197-198 (1982), "The transaction is the basis of the litigative unit or entity which may not be split * * * The law of res judicata now reflects the expectation that parties who are given the capacity to present their 'entire controversies’ shall in fact do so.”
The same evidence petitioner used to charge contempt in Contempt 1 was available to it to include 30 of the violations charged in Contempt 2. "[I]t is almost impossible to resist the conclusion that the over-all 'transaction’ here formed 'a convenient trial unit’ and that this view conforms to reasonable expectations.” (Smith v Russell Sage Coll., supra, at 193.)
Support for the court’s analysis can be found in Matter of Doherty v Cuomo (76 AD2d 14 [4th Dept 1980]). In Doherty, the Secretary of State brought a proceeding charging Doherty with employing two men to collect rents from one client’s *653 property knowing they were not licensed to do such work. The charges were sustained and a finding of "untrustworthiness” (at 16) made. While that case was on appeal a new complaint was instituted charging Doherty with employing the same to men, during the same period of time, to collect rent from a different client’s property, knowing they were not licensed to do such work. The central question as posed by the Fourth Department was whether the Secretary of State, once he had found Doherty "untrustworthy” for hiring unlicensed persons to collect rent and had punished him for that offense is precluded under the principle of res judicata from later making the same claim for the same specific act based on different evidence.
Tellingly, in Doherty (supra), as in this proceeding, the Secretary of State, prior to initiating the first proceeding, had the information it used to prove the charge in the subsequent proceeding. In language applicable here, the Court in Doherty (at 21) found that "the fact that the second action contains new evidence involving a different client of the petitioner does not sufficiently distinguish the claim of the respondent in this case from its claim in the prior proceeding so as to preclude application of the doctrine of res judicata. ”
The Court further notes (76 AD2d, at 22, supra) that in view of the measure of identity between the two proceedings, a different judgment in Contempt 2 " 'would destroy or impair rights or interests established by the first’ ” the very evil that Chief Judge Cardozo in Schuylkill Fuel Corp. v Nieberg Realty Corp. (supra) indicated the doctrine of res judicata was designed to prevent. Had these 30 new claims been joined in Contempt 1 they unquestionably would have also been dismissed by Judge Knipel, who rejected the accuracy of all the inspection reports in the face of respondent and his witness’ sworn denials. Clearly the rights of Mr. Ieraci determined by Judge Knipel in rejecting a finding of contempt in Contempt 1 would be destroyed by a contrary finding based on the same evidence in this proceeding.
Finally, successive contempt proceedings based on variations in evidence would subvert the efficient administration of justice and undermine both careful assessment of proper penalties and statutory limitations on penalties. (Matter of Doherty v Cuomo, supra; Department of Hous. Preservation & Dev. v Deka Realty Corp., NYLJ, Apr. 23, 1992, at 26, col 5 [App Term, 2d Dept].) To sustain DHPD’s position would be to sanction dozens of successive proceedings all alleging noncom *654 pliance with the same order. Each violation not timely cured could be brought as a separate proceeding, allowing DHPD to bring successive proceedings until it obtained the result it wanted. Not only is this concept of perpetual trial offensive to a litigant’s basic due process rights, it also results in intolerable hardships for an already overburdened Housing Court. Further, by bringing separate proceedings, DHPD could seek the imposition of consecutive punishments and fines and thus such fines "could be indiscriminately applied to achieve 'extortion beyond the requirements of just compensation or indemnity, and to reward the omission of exact proof by multiplying the maximum award by the number of * * *’ divisible offenses (Socialistic Co-op. Pub. Assn. v Kuhn, 164 NY 473, 476 * * *).” (State of New York v Unique Ideas, 44 NY2d 345, 350 [1978].)
Based on the foregoing, DHPD is precluded from seeking either a criminal or civil contempt finding or the imposition of civil penalties based on its claim that respondent failed to timely cure the 30 violations of which petitioner had knowledge prior to bringing Contempt 1.

Surviving Claims

The petitioner was permitted to introduce evidence on three violations (Nos. 275, 160, 334) for which it did not have evidence prior to the initiation of Contempt 1.
Violation No. 275 involves the requirement that a notice be posted stating who and where a person can be located who has a key to the building’s boiler room. Inexplicably, three of the four inspection reports indicated "no access” to confirm this condition, notwithstanding that such a sign is to be posted in the public hall to which the inspectors had access. Only the inspection report of September 2, 1992 indicated noncompliance. However, DHPD’s own videotape of the building made October 19, 1992, showed the notice posted in the hallway. Respondent testified the sign may have been temporarily removed during painting of the hallway. This violation is dismissed.
Violation No. 160 requires that the entry door to apartment 1 be made self-closing and violation No. 334 requires installation of an operable smoke detector in the same apartment. The inspection report of August 27, 1992 indicated noncompliance in respect to both violations. Respondent testified that he was in the apartment two weeks before the trial and the door closed behind him and further that he observed a smoke *655 detector at that time. Respondent claims to have installed a smoke detector in the summer of 1991 and that a new tenant moved into the apartment in July 1992.
Given that almost 2 Vi years have passed between the underlying order and DHPD’s August 1992 inspection, and in light of respondent’s testimony, it is impossible for the court to determine if these violations were never cured or whether the problems have reoccurred or whether they even exist currently. Consequently, the court is unwilling to apply the presumption that the violations still exist. Accordingly, no penalties will be imposed but an order to correct will be issued in connection with violation Nos. 160 and 334.
Further, while the court has precluded DHPD from seeking contempt and civil penalties for other claimed violations, DHPD also seeks an order to correct. An order to correct will be issued for the following:
(1) Violation No. 480 — Missing door knob on street door; respondent acknowledged this violation, stating that he had previously installed a door knob that is now gone and that in his view there was no need for a door knob.
(2) Violation No. 168 — Antennae are to be removed from roof vent risers.
(3) Violation Nos. 361, 362 and 363 — Entrance door is to be refitted and made self-closing and a door knob affixed.
(4) Violation No. 366 — Fix the loose hanging light fixture in the rear room of apartment 4.
(5) Violation No. 270 — Replace handrail at fire passageway. The landlord acknowledged that the handrail had been removed because of a tenant’s concern regarding the security of the apartment.

. Compare, Department of Hous. Preservation & Dev. v Luciani (NYLJ, June 25, 1982, at 12, col 5 [App Term, 1st Dept] [inspection reports alone are not sufficient to sustain a finding of contempt]), with Department of Hous. Preservation & Dev. v Knoll (120 Misc 2d 813 [App Term, 2d Dept 1983] [mere testimony of landlord without any supporting evidence insufficient to rebut prima facie case based on data base]).

. The testimony of Investigator Lamont Headly and the introduction of *649 a videotape detailing his inspection of the premises on October 19, 1992, a month after the trial before Judge Knipel, is all that distinguishes the evidence in this proceeding from that adduced before Judge Knipel. That inspection and tape focused on 10 specific violations.