OPINION OF THE COURT
Nora Freeman, J.
The current and past litigation concerning the child Yan Ping Z. (also known as Lisa and hereinafter referred to as Lisa) is so extensive that a thorough review of the history of the various petitions is necessary in order to provide context for the court’s rulings, which address the viability of the petitions alleging neglect and for termination of parental rights.
By order dated August 21, 2001 this court requested memoranda of law from all counsel concerning the effect on the current petitions of rulings made by another judge on an earlier neglect case, under docket No. N-10352/97. It was unclear to this court whether the allegations made in the three petitions and the rulings made by the first judge may have overlapped to some degree, and whether this court was precluded from entertaining the current petitions.
To summarize, the three petitions are as follows:
First: N-10352/97 Filed on May 7, 1997 by the Administration for Children’s Services (ACS) alleging that Lisa’s father, respondent Lin Hua C., had neglected her by abandoning her after his arrest on or about February 27, 1997
Second: B-6377/99 Filed on March 22, 1999 by Brook-wood Child Care (Brookwood) alleging that Mr. C. had abandoned Lisa for the six months preceding the filing, and that accordingly his parental rights should be terminated
Third: NA-17604/01 Filed on August 2, 2001 by ACS, alleging that Mr. C. had sexually abused Lisa before her placement in foster care in 1997; that he failed to contact ACS from November 2000 to August 2, 2001; and that he had not contacted or visited Lisa since 1997.
After two years of hearings before another judge, the first petition was dismissed on July 31, 2001. The findings included in that decision and order raise questions about the continued *153 viability of the second and third petitions. After reviewing the memoranda submitted by ACS, the Law Guardian and respondent and the extensive record through July 31, 2001, this court concludes that ACS is precluded from litigating claims of sexual abuse that allegedly occurred before February 1997, but that the claims of abandonment from the period September 1998 to March 1999 (the petition to terminate parental rights, or TPR petition) and the claims of lack of contact with ACS and the child (the second neglect petition) may proceed.
The history of this extraordinary four-year litigation can only be summarized here. Lisa (and an older sister, now an adult and not before the court) were remanded to foster care on or about February 27, 1997, following the arrest of Mr. C. Lisa has remained in care, on “remand” status, continuously since then. Although precise dates are unclear, it is not disputed that Mr. C. was released from custody in the spring of 1997 and that he traveled to China (his own homeland, as well as Lisa’s), telephoning her in April to tell her he was in China, where he expected to remain, and wishing her well. Mr. C. returned to the United States in July 1997, apparently having been extradited from Canada. He remained in a federal detention facility until November 2000, when he was released.
Counsel was appointed for Mr. C. in 1997, and (after the first withdrew) again in 1998. The fact-finding hearing on the 1997 neglect petition began in November 1999 and did not conclude until June 2001. The reasons for the long delays are not entirely clear, but the difficulties in locating Mr. C. and arranging for him to consult with counsel (via telephone and a Mandarin interpreter), as well as scheduling trial dates using telephone connections, were factors.
In April 2000, while the neglect fact-finding was underway, Mr. C. filed an order to show cause seeking visitation with Lisa, which would necessarily take place at his federal detention facility in New Jersey. ACS and the Law Guardian filed affidavits strenuously opposing visits, on the grounds that while in foster care Lisa had revealed that her father had beaten and sexually abused her before her removal in 1997; that she had experienced severe emotional problems requiring repeated hospitalization in psychiatric facilities; and that she was “deathly afraid” of him. The trial judge denied visitation on September 15, 2000, “with leave to renew.” (The request was not renewed until the second neglect petition was filed in August 2001.)
In November 2000 Mr. C. was released from prison and was able to appear in court. The fact-finding concluded with sum *154 mations in June 2001. The petition was dismissed in a seven-page written decision and order dated July 31, 2001. That decision did not mention the 1999 petition to terminate parental rights, which had remained pending throughout the two-year neglect trial. Nor did it direct Lisa’s discharge from foster care.
Two days later ACS filed a new petition, based on the allegations of sexual abuse that had been alluded to in the affidavits filed in 2000, as well as more recent lack of contact with ACS. Upon filing, ACS requested and was granted a temporary remand for Lisa, in effect continuing the foster care status that had begun in 1997.
This court received the new neglect petition and the pending TPR petition on August 7, 2001, the prior judge having been transferred to another court. Upon preliminary review of the voluminous files the court, out of concern for possible issues of collateral estoppel arising out of the rulings made by the prior judge, requested memoranda of law from all counsel. Counsel’s attention was directed to two questions:
(1) Whether ACS is barred from filing sex abuse charges in 2001 when (a) the allegations were known at least as early as January 2000, and (b) the 1997 petition was never amended; and
(2) whether factual findings made in the July 31, 2001 order dismissing the 1997 neglect case are binding on the court hearing the petition to terminate parental rights?
Claim Preclusion
Article 10 of the Family Court Act contains the statutory framework governing child protective cases. According to section 1011, the purpose of the article is “to establish procedures to help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being. It is designed to provide a due process of law for determining when the state, through its family court, may intervene against the wishes of a parent on behalf of a child so that his needs are properly met.” Family Court cases, although civil in nature, may subject a parent and child to grievous loss of a fundamental liberty interest, i.e., continuation of the parent’s custody of the child. And although a parent charged with neglect does not face possible incarceration, many courts have recognized that the loss of custody may be of comparable import. (See Stanley v Illinois, 405 US 645.)
Despite the potential loss of fundamental rights faced by a parent charged with neglect, the Family Court Act contains *155 neither a limitation of time in which charges must be filed, nor a speedy trial provision. Indeed, appellate decisions have upheld child protective prosecutions initiated up to eight years after the events alleged to have taken place. In Matter of Charles DD. (163 AD2d 744, 747 [3d Dept 1990]) the appellate court noted that, “[t]aking into consideration the broad mandate of the Family Court Act, the usual treatment of transgressions by limiting legal prosecutions thereof to a statutory period is unavailing in Family Court petitions and bears no statutory limitations. Family Court proceedings do not focus on penal sanctions but are instead directed to the protections of minors.” A new petition may also be filed notwithstanding dismissal of an earlier case against the same parent, if the later petition presents “subsequent allegations of neglect not covered by the [earlier] petition” (Nassau County Dept. of Social Servs. [Jean G.], 225 AD2d 779, 781 [2d Dept 1996]), or “a completely different time period and a different service plan than were at issue in the previous * * * proceeding.” (Matter of Jesus II., 249 AD2d 846, 847 [3d Dept 1998].) Even where the prosecution’s conduct is offensive to ordinary standards of due process, dismissal of a protective petition is unwarranted, lest the trial court “abdicated its role as parens patriae.” (Matter of Rhonda T., 99 AD2d 758, 759 [2d Dept 1984].)
While recognizing the paramount concern for protection of children and the absence of criminal sanctions, this court concludes that some respect for fundamental fairness must be afforded in child protective proceedings. In this case, although it had actual knowledge of the child’s claims of sexual and physical abuse during the pending of the first neglect petition, ACS never sought leave to amend its petition to include those charges. Instead, it filed them after the first petition was dismissed. Since Family Court neglect prosecutions are not criminal proceedings, “double jeopardy” does not apply. But rules relating to issue preclusion or mandatory joinder of claims may.
In Department of Hous. Preservation & Dev. v Ieraci (156 Misc 2d 646 [Civ Ct, Kings County 1992]) the trial court held that the New York City Department of Housing Preservation and Development (DHPD) was barred from seeking contempt based on violations which the Department knew of but did not include in a previous contempt petition which had been dismissed. In the first action, DHPD pleaded 33 violations, all of which were dismissed after trial. In its next effort, DHPD cited 33 “new” violations, which had in fact been known to it at *156 the time of the first proceeding. In denying DHPD a proverbial “second bite of the apple,” the trial court observed that (at 653-654),
“successive contempt proceedings based on variations in evidence would subvert the efficient administration of justice and undermine both careful assessment of proper penalties and statutory limitations on penalties * * * Each violation * * * could be brought as a separate proceeding, allowing DHPD to bring successive proceedings until it obtained the result it wanted. Not only is this concept of perpetual trial offensive to a litigant’s basic due process rights, it also results in intolerable hardships for an already overburdened Housing Court.”
Noting that, “In their most narrow and classical definitions, the doctrines of double jeopardy and res judicata would not be applicable to bar the [second contempt] proceeding” the court in leraci concluded that “the petitioner would still be barred from pursuing its civil contempt claims under the transactional analysis of the res judicata doctrine now favored in New York” (at 649, 651, citing Smith v Russell Sage Coll., 54 NY2d 185). The court in that case explained that
“ ‘[I]n deciding res judicata issues, we have moved to a more pragmatic test, which sees a claim or cause of action as “coterminus with the transaction regardless of the number of substantive theories or variant forms of relief * * * available to the plaintiff’ * * * [W]hat “factual grouping” constitutes a “transaction” or “series of transactions” depends on how “the facts are related in time, space, origin, or motivation, whether they form a . convenient trial unit, and whether * * * their treatment as a unit conforms to the parties’ expectations or business understanding or usage” ’ ” (Ieraci, at 652, citing Restatement [Second] of Judgments [Tent Draft No. 1] § 61).
The prevailing view, as summarized in Restatement (Second) of Judgments § 24, comment a, is that “[t]he law of res judicata now reflects the expectation that parties who are given the capacity to present their ‘entire controversies’ shall in fact do so.”
That is precisely what ACS did not do. In its second petition against Mr. C., ACS has filed charges of sexual abuse of which *157 it had actual knowledge at least as early as January 2000. At that time, testimony at the fact-finding had scarcely begun, and would continue for another 18 months. But ACS never sought leave of the court to file an amended petition, despite repeated admonitions from the trial judge that she would consider only evidence relating to the allegations included in the petition. Given the provision in section 1051 (b) for amending the pleadings to conform to the proof, and the CPLR’s liberal rules for amendment, it is unlikely that leave to amend would have been denied. Yet ACS chose instead to wait until the 1997 petition had been dismissed to file “new” charges of sexual abuse that are in fact “old” charges that should have been presented earlier.
The consequences of successive proceedings filed by a government agency “until it obtained the result it wanted” were clearly explained by the court in Ieraci (supra). Particularly worrisome to this court is the fact that the affidavits submitted in 2000 by ACS and the Law Guardian alluded to physical abuse (beatings with broomsticks and belts) as well as sexual abuse. But no allegations of physical abuse are included in the second neglect petition. Trial of the first petition took more than two years. Having waited to file the sexual abuse charges until after it lost the first case, ACS may well decide to “hold back” the charges of physical abuse for use in the event the current (second) petition is also dismissed. That would allow ACS to file a third neglect petition some five or six years after the first, with the child remaining in remand status throughout.
Such a result would be absurd. Yet ACS relies on invocation of “parens patriae” and “the best interests of the child” to justify a potentially endless series of prosecutions. Aside from the unfairness to the respondent father, there is concern for the effect on Lisa of such a procedure. Having reviewed the affidavits describing Lisa’s serious mental illness and hospitalizations in 1997 to 1998, as well as the transcript of her testimony in January 2001 (most of which consisted of “I don’t remember”) this court has grave doubts that the charges of sexual abuse dating back to 1997 can be sustained. The acts alleged (fondling of genitalia, watching pornographic films) would not have produced physical evidence. And the child’s testimony would be evaluated in light of her serious psychiatric history. (See People v Baranek, 287 AD2d 74 [2d Dept].) Holding over Lisa’s head the prospect of having to prepare for testimony about sexual abuse allegedly having occurred five years ago clearly presents a risk to her mental stability and emotional welfare. *158 After consideration of the transactional analysis of res judicata, the differences between criminal prosecutions that enjoy formal protection from “double jeopardy” and the Family Court’s civil proceedings that apparently do not, its own role as “parens patriae” and its obligation to provide due process of law, this court concludes that ACS may not prosecute charges of sexual or physical abuse that allegedly occurred before the first petition was filed and of which it had knowledge while the first petition was pending. Accordingly, paragraph 3 of the abuse petition filed on August 2, 2001 is dismissed, and the “child abuse” designation is stricken. ACS may, however, proceed on its claims of child neglect in paragraphs 4 and 5, since those charges relate to events subsequent to the original neglect petition.
The Pending TPR Petition
As a practical matter, the three petitions filed against respondent Mr. C. covered actions alleged to have taken place in three separate periods: “abandonment” as defined under article 10 of the Family Court Act, from February 27 to May 7, 1997, which charge was dismissed after trial; “abandonment” as defined in section 384-b of the Social Services Law from September 1998 to March 1999 (the TPR petition that is still pending); and “abandonment” under article 10 for the period November 2000 to August 2001 (the second neglect petition). The court must also conduct a “permanency hearing” concerning the appropriate planning goal for Lisa, which would encompass the entire period of her remand, from February 1997 to date. Based on simple chronology, this court will first schedule a hearing on the TPR petition, deferring fact-finding on the second neglect petition and a “permanency” hearing. But the legal effect of rulings made by the judge in the first case on the pending TPR case must be addressed.
Careful review of the July 31, 2001 decision and order indicates that some statements concerning the actions or inactions of Brookwood may have related to time periods beyond that encompassed by the first neglect petition. Such statements would then properly be considered dicta, and not binding on the trial judge hearing the TPR case. In order to meet its burden to prove abandonment under the Social Services Law, Brookwood must show by clear and convincing evidence that Mr. C. evinced an intent to forego his parental rights by failing for the six months preceding March 22, 1999 to contact Brook-wood or Lisa, or to send her any cards, gifts or letters, or to *159 provide any financial support. Brookwood must also demonstrate that Mr. C. was not prevented or discouraged from contacting his child or the agency. Finally, if abandonment is established, this court will in its discretion conduct a “dispositional hearing,” even though section 384-b of the Social Services Law does not formally require one. Since nearly three years have gone by since the period of alleged abandonment, it would be prudent to receive evidence relating to the parties’ current circumstances in order to determine if termination of her father’s rights is in Lisa’s best interest. (See Matter of Anthony M., 195 AD2d 315 [1st Dept 1993].) It must be noted that Mr. C.’s parental rights may not be terminated based simply on Lisa’s lengthy stay in foster care and the resulting emotional attachments between her and her foster family. As the Court of Appeals noted in Matter of Sanjivini K. (47 NY2d 374, 382 [1979]):
“A court may not terminate all parental rights * * * when there has been no parental consent, abandonment, neglect or proven unfitness, even though some might find adoption to be in the child’s best interests [citations omitted].
“These are not merely technical rules involving statutory authority, nor are they based on the assumption that a parent’s rights and interests are superior to the child’s. A child, of course, is not the parent’s property, but neither is the child the property of the State [citations omitted]. In many cases the State may, and under some legal systems undoubtedly does, find ‘better’ parents for a child even though the natural parents may be willing and able to provide care. But it is fundamental to our legal and social system, that it is in the best interest of a child to be raised by his parents, unless the parents are unfit [citations omitted].”
In the Sanjivini case, the Court of Appeals ordered the return of a child to her mother notwithstanding an 11-year separation while the child was in foster care, based on its conclusion that the parent had not neglected or abandoned her child, and that the length of the foster care placement was due largely to delays in litigation. It is imperative, therefore, that the petition to terminate Mr. C.’s parental rights be heard before other questions concerning Lisa’s future are considered.
Finally, the court turns to the question of whether Mr. C. is now entitled to a hearing pursuant to Family Court Act § 1028 *160 to determine if there is “imminent risk” to Lisa’s health or welfare if she is returned to his care pending fact-finding on the new neglect petition. Under the extraordinary circumstances of this case, such a hearing is not appropriate. The factors considered by the court include: the undisputed facts that Lisa has not lived with her father in nearly five years and that she has been hospitalized for psychiatric problems twice since then; the pendency of the long-delayed TPR petition; and the Law Guardian’s opposition even to supervised visits between Lisa and her father. A “1028 hearing” is intended to give a parent an opportunity for a prompt reunion with the child, pending trial. The history of this case shows that Lisa’s father left the United States and went to China in March or April of 1997, returning only when he was extradited from Canada in July of that year. He then remained in federal custody for over three years, until November 2000. He was in no position to demand the prompt hearing contemplated by section 1028 for return of his daughter. Given the long passage of time, this court believes that the proper balancing of the rights of parent and child is to conduct and conclude the TPR petition as quickly as possible, including a dispositional hearing, if necessary, without the intervention of a “1028 hearing.”
In order to assure that all counsel are fully prepared for the TPR fact-finding, the court directs that petitioner Brookwood shall, no later than January 31, 2002 provide to all counsel copies of its case records, indicating which portions, if any, will be offered in evidence at fact-finding, and what other sections would be offered at disposition. Counsel for Mr. C. and the Law Guardian may file written objections within 21 days thereafter. The court’s rulings on objections will be mailed to all counsel at least two weeks before trial.
Lisa’s remand with ACS/Brookwood is continued.