OPINION OF THE COURT
 

 Wachtler, J.
 

 In this consumer fraud action initially brought by the Attorney-General under article 22-A of the General Business Law, a consent judgment was entered in December, 1974 against Unique Ideas, Inc., and its principal, Ernie Tucker. But the terms of that injunction were blatantly violated when the defendants waited less than one month before offering the same "get rich quick” scheme condemned in the consent judgment to some 2 Vi million potential new customers. Liability for restitution and for civil contempt has been clearly established by the Attorney-General acting on behalf of defrauded members of the public. The extent of that liability is alone at issue on this appeal.
 

 Originally the defendants used the mails and magazine advertisements to promote sales of a $10 booklet containing Ernie Tucker’s "proven easy money secret”. Subscribers were supplied with instructions and mailing lists for home sales of the defendants’ ornamental mink novelty items. The lists were usually stale, however, and actual home sales were apparently minimal.
 

 Instead of achieving the promised 10% sales order response
 
 *348
 
 or even approaching Tucker’s purported example of making "$35,000 in just one day at home in bed with the flu through the use of the plan”, most subscribers in fact merely contributed to the defendants’ wealth by initially paying $10 for the booklet and then advancing between $53 and $695 for mail order materials. Some of those customers sustained their losses in advance of the 1974 consent judgment, others as a result of the postjudgment mailings.
 

 In December, 1975 Special Term granted the Attorney-General’s motion to hold the defendants in contempt, finding that within five days from the entry of the consent judgment they had ordered four million envelopes for new bulk mailings of identically deceptive promotional materials. Proof was adduced from four commercial mailing companies that 2,438,648 individual solicitations were mailed to prospective customers. The number of actual subscribers and the extent of their losses, however, were not ascertained.
 

 What was clearly established was that immediately after the postjudgment mailings were made, cash receipts flowing into the defendants’ accounts began to swell appreciably. Having traced these receipts to the contemptuous mailings, Special Term permitted the Attorney-General to attach a balance of some $209,000 remaining in the accounts. This was to serve as a fund primarily for reimbursing defrauded subscribers.
 

 Aside from restitution, the Attorney-General also sought to impose a civil fine of $250 for each and every one of the admitted
 
 2Vi
 
 million postjudgment mailings. The trial court found this to be theoretically within its powers since each fraudulent solicitation in its view "constituted a separate and wilful contempt in violation of the consent judgment, each being an independent misrepresentation which was completed upon the mailing of the false material after the entry of judgment.”
 

 Under this formula a fine of some $600 million could have been imposed above and beyond sums due in restitution. But Special Term found this "implausible” as well as "harsh and excessive” even under the outrageous circumstances of this case. The court therefore set a compromise figure by reducing the fine to $500,000 and further suspending all but $209,000 less reimbursement claims and expenses, but only on the condition that the defendants comply with the consent judgment in the future.
 

 
 *349
 
 The Appellate Division affirmed the major factual findings of Special Term but concluded that the maximum fine available under section 773 of the Judiciary Law was $250 multiplied by the number of bulk mailings, which that court found to constitute the number of separate contempts for purposes of gauging the maximum amount of a civil fine. Finding but four bulk mailings, the court reduced the fine to $1,000. Writing for the court but speaking for himself alone, however, Mr. Justice Kupferman would have treated "each separate reply and the servicing thereof, of several thousand, to be a separate contempt”. Given this difference of opinion the Appellate Division granted the Attorney-General permission to appeal and certified the question whether its modification was properly made.
 

 Our reading of the statute governing the amount of the fine that may be imposed for civil contempt requires a negative response to the certified question. By its unambiguous terms the statute distinguishes between the amount of the fine assessable in two separate types of civil contempt cases, one where actual damage has resulted from the defendants’ contemptuous acts and one where there may be prejudice to a complainant’s rights but "it is not shown that such an actual loss or injury has been caused” (Judiciary Law, § 773, as amd by L 1977, ch 437, § 8). In the first type of case the fine must be "sufficient to indemnify the aggrieved party”; in the latter the fine may not exceed the amount of the complainant’s costs and expenses plus $250 (§ 773; see
 
 Moffat v Herman,
 
 116 NY 131).
 

 In either case, unlike fines for criminal contempt where deterrence is the aim and the State is the aggrieved party entitled to the award (e.g.,
 
 Matter of Katz v Murtagh,
 
 28 NY2d 234; cf.
 
 Nye v United States,
 
 313 US 33, 42-43), civil contempt fines must be remedial in nature and effect (Gom
 
 pers v Bucks Stove & Range Co.,
 
 221 US 418). The award should be formulated not to punish an offender, but solely to compensate or indemnify private complainants
 
 (Geller v Flamount Realty Corp.,
 
 260 NY 346;
 
 Socialistic Co-op. Pub. Assn. v Kuhn,
 
 164 NY 473), here represented but not displaced by the Attorney-General
 
 *
 
 (see
 
 United States v Mine Workers,
 
 330 US 258).
 

 
 *350
 
 In keeping with this compensatory policy, where there is actual loss or injury the statute does not provide for a general $250 fine, single or multiple. It calls instead for an assessment that will indemnify aggrieved parties, in this case the persons who sent money to the defendants in response to the deceptive postjudgment solicitations. Although it has yet to be established exactly how many persons suffered losses, the existence of a substantial injury itself is not disputed. And the extent of that injury could not possibly be less than the $209,000 balance traced to receipts from the contemptuous solicitations and found by Special Term to represent "but the residue of a larger amount of which consumers were defrauded.”
 

 Because these losses were shown to be actual and reasonably ascertainable though not yet fully ascertained, any civil fine based on separate acts of contempt multiplied by the statutory maximum for unprovable damages would be inappropriate in this case. Even if we were dealing with a case of mere prejudice rather than actual injury, that construction would be no less problematic, for it could be indiscriminately applied to achieve "extortion beyond the requirements of just compensation or indemnity, and to reward the omission of exact proof by multiplying the maximum award by the number of the offenders” or divisible offenses
 
 (Socialistic Co-op. Pub. Assn. v Kuhn,
 
 164 NY 473, 476,
 
 supra).
 
 But we are in fact dealing with actual, provable losses and we therefore decline to adopt a construction which would substitute what would amount to exemplary damages for a reasonably certain compensatory fine.
 

 In view of the statutory distinction based on the compensatory policy for imposing fines for civil contempt, we need not concern ourselves or speculate about the number of con-tempts, for we are dealing with a single enterprise. Although many deceptive solicitations were mailed and many people were injured, it is the extent of their compensable losses and not their potential strength in numbers which should define the appropriate limits of any civil fine imposed on their behalf. Only a fine properly related to the scope of the injury rather than the potential scope of the offense will serve the compensatory purposes of the civil contempt fine.
 

 To that end and to avoid any enrichment of the defendants
 
 *351
 
 at the expense of their victims, the Attorney-General should exhaust all available means of implementing the claims procedure outlined by Special Term. Only after all reasonable avenues for locating and reimbursing claimants have" been fully explored will the ultimate fine, including all related costs and expenses, be subject to confirmation upon further hearings.
 

 Despite practical limitations on the State’s ability to achieve full restitution and indemnification, aggravated by the defendants’ predictable failure to maintain proper records, the final assessment against the defendants is not likely to fall short of the preserved $209,000 fund representing the residue of payments bilked from postjudgment subscribers. But in the unlikely event that ordinary claims procedures fail to exhaust this fund, the balance may be retained by the Attorney-General for a further suitable period to cover the discovery, submission and satisfaction of yet unknown claims.
 

 Accordingly, the order of the Appellate Division should be modified; a compensatory fine of $209,000 should be provisionally assessed against the defendants to indemnify postjudgment subscribers for their losses and the Attorney-General’s office for all related costs and expenses, subject to exhaustion of the fund; and the question certified should be answered in the negative. However, in view of the fact that no appeal has been taken by the defendants in this case, this court does not act with respect to the imposition of the $1,000 fine by the Appellate Division.
 

 Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Fuchsberg and Cooke concur.
 

 Order modified, with costs to the State of New York, in accordance with the opinion herein and, as so modified, affirmed. Question certified answered in the negative.
 

 *
 

 A fine imposed for civil contempt is payable to the "aggrieved party” (Judiciary Law, § 773). Here the Attorney-General is acting solely as a nominal party on behalf of defrauded subscribers who are the real parties in interest within the intendment of this statutory provision. It is their actual loss or injury which makes them "ag
 
 *350
 
 grieved” for purposes of the statutory fine, and it is that aggregate injury for which the statute affords indemnification.