H.W. v J.F. (2007 NY Slip Op 51116(U))

[*1]

H.W. v J.F.

2007 NY Slip Op 51116(U) [15 Misc 3d 1142(A)]

Decided on May 24, 2007

Family Court, Rockland County

Warren, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 24, 2007

Family Court, Rockland County
H.W., Petitioner,
against
J.F., Respondent.
14732

LEONARD SPERBER, ESQ.
Attorney for Petitioner
100 Garden City Plaza
Suite 205
Garden City, New York 11530
ERIC OLE THORSEN, ESQ.
Attorney for Respondent
5 South Little Tor Road
New City, New York 10956
Veronica Young, Esq.
Law Guardian
2 Congers Road
New City, New York 10956

William P. Warren, J.
On October 20, 2006, this court signed an order to show cause directing the respondent, J.F. to show cause before the court why an order should not be issued granting petitioner an order adjudging the respondent in willful contempt and granting the petitioner an order of commitment and directing the respondent, pursuant to FCA §454, to pay to the petitioner reasonable counsel fees in a sum to be determined at trial.
The petition alleged that an order was issued by this court dated July 1, 2005 which order provided for visitation between the respondent and his son, D. It claimed that in contravention of the order the respondent wrongfully and unlawfully withheld the child from the custody of the petitioner until August 31, 2006. The application states that it is brought for criminal and civil contempt pursuant to Judiciary Law §§750 and 753, CPLR 5104 and FCA §§453, 454 and 455. The respondent denied the allegations of a violation and a hearing was conducted.
H.W. testified that she is the mother of D. and J. Respondent, J.F., is the father of these children. In June of 2006, J.F. had brought an application before this court seeking permission to take D. to Israel during the summer of 2006. On July 18, 2006, the parties appeared in court at which time the issue of visitation during the summer of 2006 was discussed. Introduced into evidence was the transcript of the proceeding held on July 18, 2006. The court took judicial notice of the order of July 1, 2005 which was entered by the clerk on July 5, 2005. The July 1, 2005 order contained the following pertinent language:

The visitation of the father with the children, J.F. . . . and D. F. . . . shall be at the [*2]children's discretion including but not limited to weekend, holiday, summer and school recess visitation; and it is further
ORDERED that the father's summer vacation visitation shall be modified such that the summer visitation of the father in any year that the children attend summer camp shall be at the discretion of the children and shall include those days occurring between the close of the school year and the commencement of summer camp and two weeks in August;...
...
The transcript of the July 18, 2006 hearing contained some colloquy pertinent to the instant application. During that appearance the respondent claimed that it was his understanding that the use of the phrase "at the discretion of the children" meant that the children could come and go as they wish in the summer, without regard to the visitation time frames set forth in the order. The following colloquy occurred:

The Court:Can I say what I think (I need) (should be you mean).
Mr. F.:Yes.
The Court:There will be no set visitation scheduled at all. It will be totally up to the children when they want to see you, whenthey don't want to see you. Is that it?
Mr. F.:Correct and that's the way it was except for August.
...
Further on during the appearance of July 18, 2006, the following colloquy occurred:
The Court:Let me stop you one second, Mr. Sperber. The discretion goes with
the set times, so your understanding is that there are set times, now, whether they be every other weekend, whether they be holidays or whatever, and that those times, Mr. F. is entitled to visit with the
child, if the child agrees.
Mr. Sperber:Absolutely.
The Court:Beyond those times, there is no entitlement to visitation and Ms. W. retains the right to say no, you don't go; you know, this is not a scheduled visitation time. She retains that right.
Mr. Sperber:My understanding exactly, your Honor.
....
[*3]
Several letters were sent by the respondent to the petitioner's counsel in June of 2005 in connection with the settlement of the order of July 1, 2005. Those letters objected to the proposed order submitted by the petitioner's counsel because the respondent claimed that the order should indicate that all visitation should be at the children's discretion and that "... the children can have visitation even during the mother's time..." (see, Law Guardian's Exhibit 6, letter of June 1, 2005 from J.F. to Leonard Sperber). The order which the court signed was that submitted by the petitioner's counsel, not the counter-order of the respondent.
The petitioner testified that at the end of the 2005/2006 school year, D. had a trip to Washington, D.C. and it was arranged to pick him up at school in Livingston, New Jersey at the end of the trip. She picked him up and he came home and stayed until June 19. On that date, he went to visit his father. Thereafter, he went to summer camp on June 26 or 27th.
The petitioner said she was unable to have any contact with D. from June 19 until he went to camp even though she attempted numerous times to do so. While he was at camp, she had regular contact with him without difficulty. She next saw him on August 31, 2006. It was on July 27, 2006 when D. was on a bus on his way home from camp that Ms. W. last spoke to him before August 31, 2006.
During the period of time that D. was not in contact with her (the month of August) a scheduled bar mitzvah involving another child occurred during the weekend of August 26 and 27th. These plans had been made in December of 2005. D. knew of the bar mitzvah and he had a close relationship with the boy who was being bar mitzvahed, his step-brother JW.
From July 27th on Mrs. W. claimed she made numerous attempts to contact D. but always ended up with voicemail. She would contact Mr. F.'s telephone number and would leave a message but never got a return call. On August 21, she went to the Town of Ramapo Police Station and filed a complaint.
J.F. testified that although he received the application to hold him in contempt, the copy which he was given was not complete. The document was introduced into evidence as respondent's Exhibit A. The statutory warnings in bold print on the document apparently had been cut off in the copying and, therefore, several letters were not included. For example, the first line of the warnings read: "the purpose of this hearing is to punish y". Apparently, the letters "ou" were cut off. In the second line, the language read: "the accused, for contempt of court an' " but apparently the letter "d" was left off. There were one or two other letters left off from the warnings.
Mr. F. testified that he believed the order of July 1, 2005 which contained the language "at the discretion of the children," meant that whenever the children want to be with the father it was permissible for them to be there. He denied prohibiting D. from making a phone call during the summer to anyone.
Mr. F. testified that in July, 2006 he filed a petition in the Kings County Court because of D.'s assertion that he was refusing to go back to his mother.
During cross examination, Mr. F. acknowledged that he has, on prior occasions, filed a number of contempt motions himself and that he has the contempt language on his computer. He also acknowledged that he knew about the August bar mitzvah.
In August, he received a call from a detective about D. and he told the detective that D. was not missing but that he was there with Mr. F. Mr. F. acknowledged that D. remained with him during the entire month.
[*4]
The respondent indicated that he filed for custody in Kings County on or about July 27. He stated that prior to filing he had numerous conversations with D. who told him he didn't want to go back to his mother. On July 18, in court, the respondent had indicated an intention to file for D.'s custody.
Mr. F. denied telling D. what to say in court on August 31, 2006 when D. appeared before this court, he denied telling D. to say that he would run away if he had to go home, and he denied telling D. to say that his mother tortured him. He also said that D. did not want to go his step-brother J's bar mitzvah. He maintained that D. had said he wouldn't go back to his mother and that he wanted to stay with Mr. F.. He was asked whether he had used any influence at all to try to get D. to stay with him and he completely denied using any influence. In fact, he stated that on a number of occasions he encouraged D. to go to his mother's house. He claimed that he told D. "you should go to your mother".
As a result of the testimony of J.F., it became quite obvious to the court that it would be necessary to hear from D.F. The court had met D. on several prior occasions and found him to be a shy yet intelligent, articulate young man who was under enormous pressure from the respondent to such a degree that at one point the court had to issue an order of protection against the respondent directing him to not have any contact with D.. These prior contacts with D. had occurred in the context of "Lincoln" style hearings. Because the nature of the instant application was contempt and as a result the consequences for Mr. F. could include a commitment to a correctional center, the court felt that it could not conduct a "Lincoln" style hearing in this type of a proceeding even though the child was only fourteen (14) years of age. Therefore, it was arranged for D.'s testimony to be taken in one room where he would have with him his law guardian, but also present were the attorney for the petitioner and the attorney for the respondent, along with the Judge. His testimony would be broadcast electronically to the courtroom where the respondent would observe and hear D. testify.
D. told the court that he had a school trip to Washington, D.C. at the end of the school year 2006. He returned home to his mother and then went to stay with his father. From his father, he went to camp at the end of June and returned from camp approximately one (1) week before July ended. While at camp, he talked with both his mother and his father by cell phone.
After camp he returned to his father and told his father that he was going to his mother's on or about the 15th of August. A few days later, his father brought up the topic of living with him. D. said he didn't want to. He had no conversation with his father about running away from his mother, nor about her torturing him. He knew his father had filed for custody in Kings County. No one, including his father, tried to talk him out of living with his father. His father had the idea of drawing up a pros and cons list. Although he told his father he did not want to move in, he also did not want pressure from his father. His father took him to see a rabbi and his father and the rabbi tried to convince him to live with his father.
The next time D. saw his mother was on August 31. He had no communication with his mother at all in the month of August. He had some contact from J., his brother, but he didn't respond to J. because he was afraid of his father. He received no messages from his law guardian. He sent a few faxes to his law guardian, but his father had told him to do so.
He had a cell phone in August of 2006, but he testified that he had concerns about using the phone to call his mother and his law guardian. He claimed his father had told him not to pick up the phone and not to call his mother.
[*5]
He said he was with his father most of the time in the summer. He said his father told him something bad would happen if he called his mother. With regard to the bar mitzvah of August 24 and 25th, he told his father he wanted to go, but his father said it would be best if he didn't go.
He met with a law guardian in Kings County in connection with his father's custody petition. He told her that his mother was bothering him and that he was afraid of her. He told this court that in reality he was afraid of his father and that it was his father who pushed him to do this.
`On August 31, he was brought to this court and he spoke to this Judge. D. testified that before coming to see the Judge on August 31, his father took him into a bathroom and told him to say that his mother was bothering him and that he wanted to live with Mr. F.. He appeared before this Judge on August 31 and told the undersigned that he didn't want to live with his mother and his step-father. However, D. testified that he felt very bad when he said this and that he really didn't mean it.
D. said he feels no pressure from his mother or his step-father and that he has a good relationship with them.
It was on Sunday, September 3 that he returned to his mother's house as a result of this court's intervention on August 31, 2006. Immediately upon returning to his mother, his step-father and his brother, he told them everything that had happened. He told them that his father had told him to say everything and that he didn't really mean it.
Thereafter, he was visiting with his father on a regular schedule, but on the third visit his father had just received and read a forensic evaluation done at the direction of this court. The father, thereupon, took D. to the office of the forensic psychiatrist who had written the report. The forensic report had indicated certain statements that D. had made to the forensic psychiatrist. D. told this court that after his father read the forensic report, he began to lecture D. about what was said in the forensic and told D. that it was not true, although D. did maintain that it was true. His father took him to Rockland County, drove him to the office of the forensic psychiatrist and told him to go in to see the forensic psychiatrist and to tell him the things that he had previously told the forensic psychiatrist were lies. D. went in to see the forensic psychiatrist and told the forensic psychiatrist that what he had actually told him during the interview was true but that his father had now brought him back to the office and was telling him to tell the doctor that those prior statements were a lie. After leaving this forensic psychiatrist's office, D. was then driven to the courthouse and told by his father to go into the court and tell the Judge that the information in the forensic report was wrong and it should be changed. It should be noted that on that date, this court conducted an emergency hearing wherein it heard from D., heard the pressure that D. was under from his father, and issued an immediate, emergency order of protection directing the respondent to have no contact and to remain away from D. D. had been under enormous stress and was under incredible pressure when he appeared in court on that day after having been taken by his father to the forensic psychiatrist and to the court and had been told that the information in the forensic report needed to be corrected by D. notwithstanding that D. maintained the information was, in fact, accurate. This was an unbelievably difficult situation for a fourteen (14) year old boy to be placed in.
Some additional questioning of D. revealed that in connection with the August 31 hearing where D. came before this court, his father had told him to lie to the Judge. He stated that he is [*6]very nervous around his father. During the time he was away from his mother and his brother, he missed them a lot and his father would reassure him by saying "don't worry, you'll see them." His father also told him what to say during the forensic evaluation. Now D. is more secure because he has the order of protection.
D. says he has a very hard time speaking honestly with his father. He feels a tremendous amount of pressure from his father. He did state that he repeated to his father that he should go back to his mother but his father kept delaying and saying "we'll see." D. felt intimidated by his father. He didn't call his mother because he was afraid of his father. At the time he testified before this court in February, 2007, he said that he was not ready to see his father.
This proceeding is in actuality one to hold respondent in both criminal and civil contempt of court. The distinction was explained in Bank of Leumi v. Taylor-Cishahayo, 147 Misc 2d 685 ...

The term "contempt of court" encompasses civil and criminal contempt. The differences between the two types of contempt was set forth by the Court of Appeals in Matter of Department of Envtl. Protection v. Department of Envtl. Conservation (70 NY2d 233, 239): "This court's power to punish for civil and criminal contempt is found respectively in Judiciary Law § 753 (A)(3) and §750 (A)(3). Although the same act may be punishable as both a civil and a criminal contempt, the two types of contempt serve separate and distinct purposes. A civil contempt is one where the rights of an individual have been harmed by the contemnor's failure to obey a court order (People ex rel. Munsell v Court of Oyer & Terminer, 101 NY 245). Any penalty imposed is designed not to punish but, rather, to compensate the injured private party or to coerce compliance with the court's mandate or both (State of New York v Unique Ideas, 44 NY2d 345). A criminal contempt, on the other hand, involves an offense against judicial authority and is utilized to protect the integrity of the judicial process and to compel respect for its mandates (King v. Barnes, 113 NY 476). Unlike civil contempt, the aim in a criminal contempt proceeding is solely to punish the contemnor for disobeying a court order, the penalty imposed being punitive rather than compensatory (State of New York v Unique Ideas, 44 NY2d 345, supra ). ...
The respondent argues that his conduct in keeping D. with him beyond two (2) weeks after camp ended and continuing through August 31, 2006 does not constitute contempt of this court's order of July 1, 2005. It is argued that the use of the phrase "at the discretion of the children" renders the order subject to interpretation and therefore it lacks the clear and unequivocal mandate necessary to find a person in criminal or civil contempt. This court accepts the principle of law which requires a clear and unequivocal mandate as a pre-requisite to a finding of criminal or civil contempt. However, under the facts of this proceeding, there is no doubt that the visitation requirements of the July 1, 2005 order were clear and unequivocal. There is ample evidence to support this determination.
To begin, the parties were in disagreement over the precise language which should be included in the order of July 1, 2005. The respondent wrote to the court specifically objecting to the submission of a proposed order by petitioner's counsel because the respondent contended that all visitation was supposed to be at the children's discretion and specifically said that this meant [*7]that the children could visit with him whenever they chose, even during the time they were not scheduled to visit with him, but were to be with their mother. The court did not accept respondent's claim and signed the order submitted by petitioner's counsel.
Respondent's argument, if accepted by the court, would essentially mean that there would be no order of visitation. Rather, to accept the order as he contends, would result in the children, here D. in particular, visiting with his father whenever D. chose to do so. It would not matter whether it was during a time allocated to the mother or the father in the court order. This was clearly not the intention of the order. Instead, the use of the words "discretion of the children" applied to the time allocated to the father's visitation. Therefore, during the time set forth for the father's visitation, the child had discretion to either attend the visitation with the father or he could chose not to so attend.
Beyond the very terms of the order and the dispute regarding what language should be included in it, the colloquy which occurred in court on July 18, 2006 once again restated in the presence of the respondent that the use of the phrase "at the discretion of the children" was not equivalent to "the children could visit whenever they chose to do so." This court has no doubt that the order of visitation was clear and unequivocal as to when the respondent was entitled to visit with D. Respondent's arguments to the contrary were found to be incorrect and disingenuous.
Respondent next argues that the court cannot hold respondent in contempt because there was a failure to strictly comply with the statutory warnings required by the New York State Judiciary Law §756. In this case it is not disputed that the application papers which were served upon the respondent omitted from them several letters along the right side of the page which contained the statutory warnings. Case law has held that an application which does not contain the prescribed notice and warnings on the face of the application is jurisdictionally deficient. Barreca v. Barreca, 77 AD2d 793.
In the oft cited case of Bank of Leumi v. Taylor-Cishahayo, 147 Misc 2d 685, there were several defects in the way the notice was presented. First, it did not provide the defendant with the required "notice that the purpose of the hearing is to punish the accused for a contempt of court, and that such punishment may consist of a fine or imprisonment, or both, according to law." In that case, the court stated that since the notice requirement was couched in normal "notice of motion" language, it might deceive the defendant into concluding that this is a normal motion.
In the instant case, it can hardly be argued that this respondent could reasonably have concluded that this was a normal motion and not one designed to hold him in contempt. The language in the instant application read as follows:
PLEASE TAKE NOTICE THE PURPOSE OF THIS HEARING IS TO PUNISH Y
THE ACCUSED, FOR CONTEMPT OF COURT AN
SUCH PUNISHMENT MAY CONSIST OF A FINE O
IMPRISONMENT OR BOTH, ACCORDING TO LAW
[*8]WARNING

YOUR FAILURE TO APPEAR IN COURT MAY RES
IN YOUR IMMEDIATE ARREST AND/OR
IMPRISONMENT
FOR CONTEMPT OF COURT.
No reasonable person could misconstrue the nature of the proceeding or the potential consequences. Certainly, this respondent was very familiar with court proceedings having been litigating in this court and Kings County for many years. During questioning by the petitioner's counsel, respondent even acknowledged having the statutory warnings of Judiciary Law §756 on his own computer and having brought contempt applications against others. There is no doubt respondent had actual notice of and knew that the nature of the proceeding was to hold him in contempt and that the consequences could include a fine or jail.
In the Bank of Leumi v. Taylor-Cishahayo, id, the second failure the court found was that the layout of the face sheet detracted from the seriousness of the remedy sought. No similar argument can be advanced in this instant proceeding. The court, in that case, said that the purpose of the statement is defeated when the notice is not readily apparent to one reading the paper. In the instant case, the purpose is readily apparent.
Lastly, the court in Leumi v. Taylor-Cishahayo, id, said that the statute requires the warning be "printed or typewritten" and that the use of a rubber stamp and ink in that case did not meet the requirement. There, the intensity of the lettering was uneven and there existed a danger of the ink running if the page became wet. No similar argument can be advanced in the instant case.

The function of the court is to render justice, not to perpetuate injustice. Contempt is the harshest remedy available in a civil action. It can subject the contemnor to fine or imprisonment, or both. Therefore, the statutory notice and warning requirements must be strictly enforced to insure that defendants are made aware of the severe penalties for their failure to comply with the subpoena. Bank of Leumi v. Taylor-Cishahayo, 147 Misc 2d 685, 690.
The facts of this proceeding demonstrate beyond any reasonable doubt that the respondent was made aware of the severe penalties which could potentially be imposed.
Judiciary Law §756 states as follows:
... the application shall contain on its face a notice that the purpose of the hearing is to punish the accused for a contempt of court, and that such punishment may consist of fine or imprisonment, or both, according to law together with the following legend printed or typed written in a size equal to at least 8 point bold type:

WARNING
[*9]
YOUR FAILURE TO APPEAR IN COURT MAY RESULT IN YOUR IMMEDIATE ARREST AND/OR IMPRISONMENT FOR CONTEMPT OF COURT.
In Glen v. Glen, 262 AD2d 885, the Appellate Division, Third Department reviewed a matter where the respondent had been found in willful violation of a prior court order and committed to jail for six (6) months. That respondent had been found in "offensive violation" of an order of visitation after he relocated to South Carolina with the children even though petitioner had been granted visitation on Tuesdays and alternate weekends. In discussing respondent's argument that the lower court's finding was procedurally infirm, the court noted that that respondent was clearly aware that the nature of the proceeding was his claimed violation of the prior court order of visitation. Other cases had held that where the statutory notice is lacking completely, the application is fatally defective. Mente v. Wenzel, 192 AD2d 862, citing Matter of Rappaport, 58 NY2d 725, Bigman v. Dime Sav. Bank, 138 AD2d 438; Murrin v. Murrin, 93 AD2d 858.
In the instant case, we are not confronted with a lack of the statutory notice nor an unsophisticated respondent. What we have here is service of a notice that complies in all respects with the requirements of Judiciary Law §756, except that "OU" is left off of "YOU"; "D" is left off of "AND"; "R" is left off of "OR"; and "ULT" is left off of "RESULT". However, no reasonable person could possibly mistake the notice given in this case as anything other than a clear warning that the purpose was contempt and punishment could consist of a fine or imprisonment or both. It is clear to this court that the notice in this case was sufficient to comply with the requirements of Judiciary Law §756. This respondent had ample notice of the nature of the proceeding and the potential consequences. The purposes of the statute have been clearly met.
After considering all of the testimony and evidence presented, it is the court's determination that the respondent, J.F., was not a credible witness. His testimony was contradicted by his fourteen (14) year old son in many ways. There are numerous examples of significant discrepancies between the information presented to this court by Mr. F. and that which was offered by his fourteen (14) year old son. These are detailed in prior parts of this court's decision. The conclusion of the court is that it accepts as credible the testimony of D. and does not accept as credible that of his father, J.F..
It is also clear to this court that the respondent engaged in multiple acts of bad behavior. He has placed his fourteen (14) year old son in a position of enormous pressure. Some of the examples of this pressure include Mr. F.'s taking this fourteen (14) year old child to the office of the forensic psychiatrist who had conducted a forensic evaluation of the family and telling D. to go into the office of the psychiatrist and essentially tell the psychiatrist that what he had previously told him were lies. What a horrendous situation in which to place to fourteen (14) year old child! But Mr. F. made it worse. After leaving the forensic psychiatrist's office, he then took D. to the courthouse and informed D. that he was to go into the court and tell the Judge that the information in the forensic report was incorrect and it should be changed. Can you imagine a fourteen (14) year old child being told to walk into a courthouse and go see a Judge and tell him to change a report? This is some of the worst parental behavior, short of physical abuse, that this [*10]court has ever observed in a parent. But Mr. F. did not stop there. According to his son, whom the court believed, Mr. F. proceeded to tell D. to lie in court, prior to his appearance on August 31 at a hearing on the question of a habeas corpus petition brought by the child's mother.
Mr. F.'s claims of the child wanting to stay with him, trying to talk the child out of doing so, maintaining that D. did not want to go to his step-brother, J.'s bar mitzvah, claiming that D. said he would run away if he had to return to his mother, and other similar statements are not believed by this court. Mr. F. is a man who has put enormous, unjustifiable pressure on his fourteen (14) year old child. In addition to doing this, he has violated the order of this court by not returning this child after a two (2) week visit in the summer of 2006. He is found in violation of the court's order of July 1, 2005 and he is found in contempt of court for violating this court's order.
New York State Judiciary Law permits an offender to be imprisoned for a period of up to six (6) months as a consequence of a criminal contempt. See N.A. Development Co. Ltd, 99 AD2d 238.The determination of the court is that the respondent shall be sentenced to ten (10) days of community service in the Sheriff's Community Service work program as an alternative to incarceration. His service is to begin on Sunday, July 1, 2007 and it shall continue on each Sunday thereafter for ten (10) successive Sundays. Annexed to this order is a standard order of community service to the Sheriff's Community Service work program. The respondent is directed to follow the requirements of that order.
In addition, the respondent caused the instant application to be made by the petitioner and should be required to hold her harmless from any and all expenses that she has incurred in connection with this proceeding. As was aptly stated by the Appellate Division Second Department in Gerstein v. Gerstein, 302 AD2d 447:

Considering the equities and relevant circumstances, the Family Court improvidently exercised its discretion in denying an attorney's fee. The father's conduct in failing to produce the child for visitation with the mother, which was provided for in the stipulation signed only slightly more than three months earlier, resulted in unnecessary litigation and caused the mother to incur an additional attorney's fee (see Morrissey v. Morrissey, 259 AD2d 472, 473, 686 NYS2d 71; Mastrandrea v. Mastrandrea, 268 AD2d 293, 294, 702 NYS2d 19). An award of attorney's fee of $3,000 is appropriate.
Consequently, the court directs counsel for the petitioner to submit to this court within two (2) weeks from the date of this determination a written application detailing each and every expenditure and counsel fee incurred by the petitioner in connection with this proceeding. Respondent shall have one (1) week to submit any response to the application. Upon receipt of respondent's response, if any, the court will determine whether a hearing is necessary on that question.
The foregoing constitutes the decision and order of the court.
E N T E R
Dated: New City, NY______________________________
May 24, 2007HON. WILLIAM P. WARREN, J.F.C.
TO: