People v L.G. (2024 NY Slip Op 24101)

[*1]

People v L.G.

2024 NY Slip Op 24101

Decided on March 29, 2024

Supreme Court, New York County

Newbauer, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on March 29, 2024
Supreme Court, New York County

The People of the State of New York,

against
L.G., Defendant, and Office of Mental Health, Non-Party, Respondent.

Ind. No. 01411/2020; 02118/2021

For the Petitioner L.G.: Jennifer Hose, Legal Aid Society
For the Non-Party Respondent: Caroline Wallitt, Office of the New York State Attorney General

April A. Newbauer, J.

The defendant, L.G., has moved pursuant to New York Judiciary Law § 753(A) and § 750(A) to hold the Office of Mental Health (OMH), along with Dr. Ann Marie T. Sullivan, OMH Commissioner, and Li-Wen Lee, the Associate Commissioner of the Division of Forensic Services, in both civil and criminal contempt of court. The defendant alleges that OMH failed to timely comply with a court order committing defendant to its care and ordering OMH to place her in an appropriate facility. The motion is decided as follows.
Factual and Procedural History
Defendant L.G. was indicted for assault in the second degree and related charges. On June 8, 2023, a competency exam of L.G. was ordered pursuant to C.P.L. § 730. L.G. was evaluated on June 20 and found unfit. On August 10, this court issued an order committing L.G. to the custody of Commissioner Sullivan and ordering that L.G. be transferred to an appropriate institution "forthwith."[FN1]
The next day, August 11, 2023, OMH designated Mid-Hudson Forensic Psychiatric Center as the facility to which L.G. was to be transferred.
Five months later, L.G. was still on Rikers Island and in the custody of the Department of [*2]Correction (DOC). On January 11, 2024, counsel for L.G. reached out to OMH to inquire as to why L.G. had not been transferred. See Exhibit E. Receiving no reply from OMH, counsel for L.G. emailed DOC's Custody Management Captain with the same inquiry. DOC informed defense counsel that they were "awaiting further instructions from Mid-Hudson regarding when they will accept [L.G.] into custody based on the available bedspace in their facility." Exhibit D. On January 17, OMH responded that there were two other female inmates "ahead" of L.G. and that she would be transferred "following that," although no specific timeline was provided. Exhibit E.
On February 1, 2024, counsel for L.G. filed a motion requesting the court issue a second order, commanding OMH to immediately admit L.G. to a facility. Counsel also filed an order to show cause pursuant to Judiciary Law § 753(A) and § 750(A) as to why Commissioner Sullivan and Associate Commissioner Lee should not be held in contempt for failing to admit L.G. to an appropriate facility as per the court's order. On February 6, L.G. was finally transferred to Mid-Hudson. On February 15, OMH filed an affirmation in opposition to the defense's motion, urging that the court to dismiss the motion. On Friday, February 16, the court held a hearing on the motion and both parties made oral arguments before the court. On March 1, counsel for L.G. submitted a reply to OMH's written and oral arguments and on March 8, OMH submitted a reply to L.G.'s written and oral arguments.[FN2]

 Analysis
Counsel for L.G. argues that this court's August 10, 2023 order expresses an "unequivocal mandate" directing OMH to designate an appropriate facility for L.G. and notify DOC, so that L.G. could be transferred to the institution "forthwith." L.G.'s Affirmation, p. 8. Counsel asserts that in taking more than five months to effect L.G.'s transfer, OMH "willfully disobeyed" the order. Although the parties are correct that the defense's request for the immediate transfer of L.G. to Mid-Hudson became moot after February 6, 2024, the court will still issue a ruling on the question of contempt.
I. Civil Contempt
1. Elements of Civil Contempt
Judiciary Law § 753(A) and § 750(A) give the court power to punish individuals or parties for civil contempt and criminal contempt, respectively. To hold a party in civil contempt for disobeying a court order under Judiciary Law § 753(A), the movant must establish three things: 1) a court order establishing an unequivocal mandate was in effect and was disobeyed 2) the party knew about the order, regardless of whether it was actually served on the party 3) the rights of a party to the litigation were prejudiced. See McCain v. Dinkins, 84 NY2d 216 (1994). Civil contempt has as its aim the vindication of a private right of a party to litigation and any penalty imposed upon the contemnor is designed to compensate the injured private party for the [*3]loss of or interference with that right. See McCormick v. Axelrod, 59 NY2d 574 (1983), (citing State of New York v. Unique Ideas, 44 NY2d 345 (1978)).
OMH first argues that the August 10, 2023 order issued by this court was not unequivocal because it did not list "a deadline, framed as either a date certain or a specific period of time, by which Defendant's transfer was to be effectuated." OMH Opposition Memo, p. 3. OMH asserts, without citing any case law, that "forthwith" is "is a subjective fact-dependent term." Id. The court does not agree. Courts have interpreted the meaning of this term many times, including in Ayers v. Coughlin, 72 NY2d 346 (1988), as the defense notes. The issues in Ayers were not dissimilar to those present in the matter before the court; in Ayers, a suit was brought against the DOC commissioner due to DOC's failure to accept inmates after they were sentenced from local jails to state correctional facilities in a timely manner. The dispute was over the interpretation of CPL § 430.20(1), which stated that, after being sentenced, "the defendant must forthwith be committed to the custody of the appropriate public servant and detained until the sentence is complied with." The court held that "forthwith" meant "that it is to be done without delay, at once, promptly." Id. at 353. The court acknowledged that in using "forthwith" instead of listing a specified number of days, the legislature intended to allow for some flexibility. However, the court maintained that "any such flexibility in 'forthwith' simply cannot accommodate the Commissioner's view that the statute vests discretion in DOCS to accept defendants from county jails when it deems it prudent or appropriate to do so." Id. at 353. The Court of Appeals ultimately affirmed the Albany Supreme Court's ruling that the transfer of inmates to state custody had to occur within ten days of sentencing. Id. The Ayers court's interpretation of "forthwith" was based on several prior decisions in which courts had interpreted the term similarly. See Crespo v. Hall, 56 NY2d 856 (1982) (stating that " 'forthwith' here means without delay"); see also County of Nassau v. Cuomo, 121 AD2d 428 (1986) (" 'forthwith' " means without delay, and cannot be read to permit the transfer of prisoners to the appellants-respondents only when they deem it to be prudent or appropriate").
OMH argues in its second reply that the court's holding in Ayers is not relevant because "a delay in transfer from one prison facility to another prison facility cannot be compared to a delay in transfer from a prison facility to a forensic psychiatric facility, which requires a higher level of specialized care." OMH Sur-Reply, p. 3. However, the Ayers court's interpretation of "forthwith" is not anomalous or somehow unique to the prison transfer context. Courts have interpreted the term similarly in other contexts. See, e.g. 51 St. Nicholas Realty Corp. v. City of New York, 218 AD2d 343, 348 (1d Dept. 1996) (holding that a statute demanding the Superintendent of Building demolish unsafe buildings "forthwith" meant that the Superintendent take action "allow[ing] for minimal delay"). Moreover, even if transferring an individual to a psychiatric facility reasonably takes longer than transferring an individual between prison facilities as OMH argues, OMH failed to transfer defendant L.G. to an appropriate psychiatric facility for nearly six months. There is simply no credible argument that this transfer can be said to have occurred "forthwith."
Next, L.G. must demonstrate that OMH knew about the court's order. There can be little debate on this front: Exhibit C of defense's motion is a designation notice sent from OMH to Mid-Hudson Psychiatric Center, stating that the facility has been designated to receive L.G. The notice states that L.G. is ordered to be committed under C.P.L. § 730.50 due to the court's August 10, 2023 order. The notice is dated August 11, 2023.
Third, L.G. must demonstrate that her rights were prejudiced. L.G.' rights were violated. [*4]L.G. was entitled to begin the restoration process once the court ordered her to be committed to the custody of the mental health commissioner. The wait for more than five months for treatment designed to restore her to competency constitutes prejudice.[FN3]
OMH argues in response that:
[W]hile on a waitlist for admission to a secure OMH facility, inmates are not lacking in psychiatric treatment and care. They have access to psychiatrists, medication, and therapy while incarcerated. If inpatient care is required, Corrections Law 508 can be used to admit an inmate to Bellevue Hospital where they can receive appropriate care and treatment. Their treatment does not begin and end at a forensic psychiatric facility.
Sur-reply, p. 2.
Since OMH has placed the treatment inmates receive while in DOC custody at issue, the court will briefly address the quality of mental health care provided on Rikers Island, where L.G. was forced to remain for an additional five months due to OMH's delay.
First, as discussed above, OMH itself argues in its papers that correctional institutions such as Rikers are distinct from forensic psychiatric hospitals "which requir[e] a higher level of specialization." Id. at 3. Of course, forensic psychiatric hospitals are tasked not only with providing the life-saving treatment that allows defendants to regain control of their lives, but also with restoring these individuals to fitness so that they may eventually proceed to trial. C.P.L. § 730.50. For instance, at Kirby Forensic Psychiatric Center—one of the facilities in New York state that receives defendants found unfit for trial—patients "received written and verbal instruction describing the legal process and also underwent mock trials shown on video equipment to help learn and understand basic legal procedures . . . patients received short-term psychotherapy or cognitive therapy to address specific psychological problems that appeared to be interfering with their competency restoration."[FN4]

Furthermore, there is no question that Rikers Island is in a state of crisis and has been for years. In People ex rel. Burse v Schiraldi, 74 Misc 3d 927 (NY Sup. Ct. 2021), this court ordered the release of an inmate, Relator G, from Rikers under the Due Process Clause of the Fourteenth Amendment, finding that the Department of Corrections (DOC) was deliberately indifferent to an unacceptable risk of harm to him. During his evidentiary hearing, Relator G testified that he was physically assaulted multiple times by groups of other inmates, denied medical care by DOC staff, and prevented from accessing adequate amounts of food and water. Id. The following year, in People v. Ayala, 76 Misc 3d 1211(A) (Bronx Sup. Ct. 2022), the court, citing Schiraldi, ordered that the defendant be released on his own recognizance despite previously ordering monetary bail due in part to the "conditions at Rikers Island." On December 22, 2023, approximately four months after L.G. was found unfit, the independent monitor tasked with evaluating the conditions at Rikers pursuant to a consent decree reached in Nunez v. N.Y.C. Dept. [*5]of Correction, 1:11-cv-05845 (S.D.NY Oct. 21, 2015) (Dkt. No. 249), published a status report finding that the conditions at the jails remained "grave." Dec. 22, 2023 Status Report, p. 1.
Reports on and evaluations of Rikers make it clear that inmates suffering from acute mental illness, such as Ms. L.G., are at even greater risk there than others. While OMH maintains that L.G. and others had access to mental health treatment while incarcerated at Rikers, the DOC's own reports have documented thousands of instances in which detainees were referred for medical appointments but did not ultimately attend the appointments for a variety of reasons. The most recent report from December 2023 documented 11,930 missed appointments during that month alone.[FN5]
Since September 2021, eight individuals incarcerated at Rikers have died by suicide. Id. at 107. In a September 2022 report that analyzed suicides and drug-related deaths at Rikers during the previous year, investigators found pervasive problems regarding "appointment scheduling, unfulfilled referrals, and lack of follow-up" for medical and mental health care at the jails. In one instance, a detainee missed 26 medical appointments over the course of a four-month period—17 of which were because DOC failed to produce him. In another, a detainee who was diagnosed with schizoaffective disorder and taking the antipsychotic medication Haloperidol, did not receive medication until 12 days after his admission to a medical facility, despite the Department of Correctional Health Services' (CHS) knowledge of his condition. Both detainees ultimately died while incarcerated at Rikers—one from suicide and one from acute drug intoxication.[FN6]

Of course, OMH is not responsible for the crisis at Rikers Island and the court does not mean to suggest otherwise. However, given the current situation at Rikers, the court would be remiss if it did not acknowledge that Rikers is, at present, one of the worst places for mentally ill individuals such as L.G. to be for any length of time, let alone a prolonged period. OMH does not counter in its papers or in a separate affidavit that L.G. did in fact receive mental health treatment of any kind while at Rikers.
2. OMH's Defenses
OMH makes several additional arguments why it should not be held in contempt. The gist of these arguments is that OMH should not be held in contempt because it simply could not have transferred L.G. to a psychiatric facility any sooner than it did due the large increase in the number of defendants ordered to be committed under C.P.L. § 730. Although the court does not intend to minimize the difficulty of the challenges facing OMH, it cannot accept that OMH did everything within its power to hasten the transfer of L.G. First, neither OMH's two written submissions, nor its oral argument before the court, introduced sufficient evidence to convince the court that OMH exercised due diligence in an attempt to comply with the court's order. While OMH lists and then dismisses each potential suggestion made by L.G. as to what OMH could [*6]have done to transfer her more quickly, it fails to articulate solutions it pursued or advocacy efforts it made to secure additional funding or open new facilities.
Additionally, while OMH states that "[t]he CPL 730 waitlist problem is clearly a complex one with no easy or quick solution," it must be noted that OMH was well aware of the crisis in available beds for individuals found unfit for trial long before February 1, 2024, when L.G. filed her motion. In the affidavit OMH filed in response to L.G.'s motion, Matthew Schatzel, director of OMH's Bureau of Institutional and Transitional Services stated that, "while OMH always seeks to effectuate admission as soon as possible, unfortunately admission to the designated secure facility is rarely immediate, and can often take weeks or months . . ." Schatzel Feb. 15 Affidavit, p. 3. OMH acknowledges that at the time L.G. was designated to be transferred to Mid-Hudson, there were 61 people ahead of her on a waitlist also waiting for admission to a forensic psychiatric center. Id. at 2. In describing the difficulties of maintaining an adequate supply of forensic beds, OMH explains that the number of 730 restoration orders has "nearly doubled since 2011," with particularly dramatic increases beginning in 2022. Id. at 3. In short, OMH was aware of rapidly increasing numbers of individuals requiring placement in forensic psychiatric hospitals—indeed, it kept careful track of the rising numbers—but then failed to respond adequately to an urgent problem that should have commanded its full attention.
Courts have and should refuse to allow responsible parties to evade their mandates simply because compliance with the mandates is challenging in the absence of sufficient funding or other resources. Once again, Ayers is instructive. In Ayers, the corrections commissioner argued that state facilities were already dangerously overcrowded, and that courts must assess the degree of overcrowding at different state facilities before it could order DOC to take custody of inmates. Ayers v. Coughlin, 72 NY2d 346, 354 (1988). The commissioner's concerns were certainly not without basis: New York's prison population increased rapidly throughout the 1980s, nearly tripling over the course of the decade.[FN7]
However, the court rejected this practical argument, calling it "a plea to the courts to redistribute responsibility for housing the State's vastly expanded prison population." Id. at 354. As the court explained, the difficult realities presented by the expanding prison population could have no bearing on its decision regarding the responsibilities DOCS had for the individuals in its custody, stating, "[s]uch a plea for change in the law is appropriately directed to the legislative and executive branches of government, not to the courts." Id.
Courts have held parties in civil contempt in similar situations. For example, in McCain v. Dinkins, 84 NY2d 216 (1994), the court held the City of New York and four city officials associated New York City Human Resources Administration (HRA) and the Department of Homeless Services (DHS) in contempt for failing to provide emergency housing for unhoused people in compliance with a New York State directive. The directive ordered the city to provide emergency housing immediately to eligible unhoused individuals and prohibited the practice of having these individuals remain in welfare offices while awaiting placement. Id. at 221-23. The court found that "the [c]ity and the four cited officials repeatedly failed to measure up to the essential compliance goals of these court orders." The defendants argued that they attempted in good faith to comply with the directive, but that it was simply impossible. Id. at 222-230. The [*7]court characterized the defendants' arguments in the following way:
They plead for the Court's understanding of the seemingly insurmountable shortage of housing to meet the problem, the crisis and the emergencies. They note that the supply and the uncontrollable influx of families and the unmatched demand are the dominating societal forces driving the homeless problem and evading plenary solution. They argue that they acted in good faith and to the best of a municipal ability to fulfill the court orders. In support of this claim, appellants recite increased demand and a series of failed strategies. In effect, they throw up their hands and say they did all they humanly or officially could do.
Id. at 223. While the court acknowledged that the problem of housing the homeless is "daunting," it also explained that neither the "feasibility of obedience" nor the "intractable or herculean municipal efforts of a financial or political variety" were at issue. Id. at 226. Instead, the court had to consider "detailed and affirmed findings of a serious, significant and persisting failure to comply with judicial decrees." Id. at 226-27. Ultimately, the court upheld the lower court's determination that the defendants were in contempt, and also upheld the fines against the defendants. The court concluded with the following statement: "[w]hile political solutions for complex societal problems like homelessness test the foundations of government, the adjudication of contempt is all that this record presents in the judicial process and sphere." Id. at 230.
OMH's arguments are quite similar to those made by the defendants in Ayers and McCain. OMH argues:
While [we are] well aware of the implications of having a wait list for felony CPL 730 admissions, it is simply not possible for OMH to instantly create new forensic beds, or do so within any relatively short timeframe . . . OMH should not be held in contempt because multiple factors outside of its control made it impossible to transfer Defendant before February 6, 2024.
Schatzel Feb. 15 Affidavit, p. 5-6. OMH discusses at length what it believes are the causes of prolonged wait times for beds in psychiatric center, explaining that the number of CPL 730 restoration orders in New York has almost doubled since 2011 while the COVID-19 pandemic has simultaneously limited bed space and delayed discharges. However, OMH can no more blame rising numbers of restoration orders or COVID, than the defendants in Ayers and McCain could escape responsibility by pointing to an expanding prison population or a lack of emergency housing. The court need not disagree with OMH about the complex causes of the current bed shortage nor the challenges present in finding a workable solution; the question before the court is simply whether L.G. proved the elements of civil contempt and the court finds that she did.
OMH argues, incorrectly, that it should not be held in contempt because its conduct was not "willful." OMH Opposition, p. 4. Willfulness is not a required element of civil contempt. See Emigrant Bus. Credit Corp. v. Hanratty, 2024 NY Misc. LEXIS 429 (2024) (holding that "'[i]ntent or willfulness is not required to hold a party in contempt for disobeying a court order or subpoena'") (quoting Yalkowsky v. Yalkowsky, 93 AD2d 834, 835 (2d Dept 1983)).
3. Penalty
Upon a finding of civil contempt, the court can impose a monetary fine upon the party in contempt. See New York Judiciary Law § 753(A) ("A court of record has power to punish, by fine and imprisonment, or either, a neglect or violation of duty, or other misconduct, by which a [*8]right or remedy of a party to a civil action or special proceeding, pending in the court may be defeated, impaired, impeded, or prejudiced"); see also, e.g. McCain v. Dinkins, 84 NY2d 216 (1994). The court will impose a fine of $1,000 on OMH, the party in contempt, to be paid to L.G. The court acknowledges that this fine is akin to a slap on the wrist in response to an issue of extreme concern. OMH has failed to take appropriate action in response to a years-old problem that continues to have dire consequences for the individuals in its care. Additionally, the court is concerned that OMH may continue to drag its feet, and more defendants will have an experience similar to L.G. In its reply papers, OMH states it is "currently in the process of embarking upon construction at Mid-Hudson to increase capacity and has recently added a unit for CPL 730 patients to MPC." OMH Feb. 15 Affidavit, p. 6. Equivocal and vague language such as "currently in the process of embarking upon" is concerning to the court.
Penalties for civil contempt should be assessed with an eye towards their "remedial nature and effect." See McCain v. Dinkins, 84 NY2d 216, 229 (1994). With L.G.'s case alone before us, the court is unable to impose a fine on OMH that would reflect the true magnitude of the harm being caused. In McCain, it was appropriate for the court to impose a more significant financial penalty because the relief was granted in response to entire class of harmed individuals.
2. Criminal Contempt
In addition to civil contempt, L.G. asks the court to hold OMH in criminal contempt for failing to comply with the court's order. As L.G. herself acknowledges, the distinction between civil and criminal contempt is "the degree of willfulness of the subject conduct with criminal contempt requiring a higher degree of willfulness." Defense Affirmation, p. 8-9. In support of her argument that OMH is guilty of criminal contempt, L.G. cites Dept. of Envt. Prot. of City of NY v. Dep't of Env't Conservation of State of NY, 70 NY2d 233, 239 (1987). In that case, the court found Central Hudson Gas & Electric Corporation guilty of criminal contempt when the company continued to burn coal despite a partial stay order being granted by the court. The Court of Appeals found that based on the record before them, the company was "not acting in good faith." Id. at 241.
Based on the record before us, the court cannot conclude that OMH was failing to act in good faith or was willfully ignoring the court's order requiring L.G.'s transfer. In the aforementioned case, it was entirely within Hudson's control whether or not to burn coal. Hudson, despite being aware of the stay, chose to burn coal anyway, in contravention of the court's order. As OMH described in its papers, it must work in partnership with a variety of other actors, ranging from the governor of New York, to New York City's District Attorney, in order to place defendants found unfit in appropriate facilities. While the court finds that ultimately, this complicated reality does not absolve OMH of its responsibility to sound alarm bells and demand assistance to rectify the problem, it is relevant to the question of OMH's degree of willfulness and question of good faith. Finding the evidence introduced by L.G. to be insufficient, the court does not find OMH to be guilty of criminal contempt.

Conclusion
The question of how to restore mentally ill defendants to competency while keeping both themselves and the community safe is an immensely difficult one. The logistical complexities that arise in the context of securely housing and treating these individuals in a borough of 1.69 million people are enormous. While OMH bears responsibility for doing so, doing so effectively will require the cooperation of multiple parties. As OMH notes in its motion papers, opening new facilities requires additional funding from the Office of the New York State Governor. [*9]Additionally, both OMH and L.G. explain that ensuring available beds exist for individuals who require inpatient treatment depends heavily on the Manhattan District Attorney's Office because the DA's Office must affirmatively consent to allowing defendants found to be unfit to receive outpatient treatment. In their oral argument, attorneys for L.G. emphasized that the DA's Office has approved extremely few defendants for outpatient treatment; in 2023, only six defendants were approved. It now appears that the Manhattan DA's Office is considering outpatient treatment for more individuals, and doing so would relieve some of the strain on OMH to find inpatient treatment facilities for an influx of defendants.
Ultimately, the question of what makes good policy was not the one before the court. This court has only to decide whether the record supported a finding that OMH was in civil and criminal contempt of court. The order issued by this court on August 10, 2023 was clear. The court rejects the argument that "forthwith" is vague or ambiguous in any way. See Ayers v. Coughlin, 72 NY2d 346 (1988); 51 St. Nicholas Realty Corp. v. City of New York, 218 AD2d 343, 348 (1d Dept. 1996). OMH was undeniably aware of the court's order, and its failure to take timely action prejudiced L.G. For the reasons discussed throughout this opinion, the motion for criminal contempt is denied and the motion to hold OMH in civil contempt is granted. The court orders the party found in contempt to pay $1,000 to L.G. See New York Judiciary Law § 753(A).
This shall constitute the decision and order of the court.
Dated: March 29, 2024
New York, New York
April A. Newbauer
Acting Supreme Court Justice

Footnotes

Footnote 1: The court's August 10 order is attached as Appendix 1.

Footnote 2: The court considered the following papers: "Defendant's Order to Show Cause to Punish for Contempt, Affirmation & Exhibits" dated February 1, 2024; "Defendant's Reply to OMH's Opposition" dated March 1, 2024; "Affidavit of Matthew S. Schatzel" dated February 15, 2024; "Affidavit of Matthew S. Schatzel" dated March 7, 2024; "OMH's Opposition to Defendant's Order to Show Cause" dated February 15, 2024; and "OMH's Sur-Reply" dated March 8, 2024. The court also reviewed the transcript of the hearing held on defense's motion on February 16, 2024.

Footnote 3: The court is also mindful that delays of this nature can create significant public safety and due process concerns. The longer it takes to restore a defendant to competency, the more likely it is that witnesses' memories will fade and the harder it is for the court to guarantee a fair trial for everyone.

Footnote 4: Evan Schwalbe & Alice Medalia, Cognitive Dysfunction and Competency Restoration: Using Cognitive Remediation to Help Restore the Unrestorable, 35 J. of the Am. Acad. of Psychiatry and the L. Online 518 (2007).

Footnote 5: N.Y.C. Dept. of Correction, Monthly Report on Medical Appointment Non-Production December 2023, https://www.nyc.gov/assets/doc/downloads/pdf/Medical%20Non-Production%20December%202023.pdf (last visited Mar. 29, 2024).

Footnote 6: Board of Correction, Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody, https://www.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/2021-suicides-and-drug-related-deaths-report-and-chs-response.pdf (last visited Mar. 29, 2024).

Footnote 7: Joshua Aiken, New York's Prison and Jail Populations, Prison Policy Initiative (May 2017), https://www.prisonpolicy.org/graphs/NY_Prison_Jail_Population_1978-2015.html.